# EXHIBIT   A

**Troutman Pepper Locke LLP**
Joseph N. Froehlich
305 Church at North Hills Street
Suite 1200
Raleigh, NC 27609
(919) 578-6337
*Attorneys for Plaintiff Spencer Savings Bank*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SPENCER SAVINGS BANK, S.L.A.,<br><br>        Plaintiff,<br><br>   v.<br><br>BNK INVEST, INC., ROBERT SEPERSKY, JONATHAN GOLDMAN, RONALD RAGANELLA, ROBERT MITCHELL, WILLIAM R. DOSSENBACH, JORDAN FARKAS, HARVEY SCHAFFLER, LEVI C. PUREC, TIMOTHY J. KLACE, KENNETH METVINER, LAWRENCE SEIDMAN, BRAD D. BUTLER, RICHARD J. LASHLEY, JOHN H. MEREY, LEO M. GOLDNER, MARK A. GOLDSTEIN, MICHAEL D. ABNERI, and JOHN DOES 1–4,<br><br>        Defendants. | Civil Action No.<br><br>Electronically Filed<br><br><br><br><br>**PLAINTIFF'S RACKETEERING COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Spencer Savings Bank, S.L.A. ("Spencer"), which maintains its principal place of business at 611 River Drive, Elmwood Park, New Jersey 07407, by counsel, files this Complaint against Defendants BNK Invest, Inc. (c/o The Corporation, 500 North Broadway, Suite 265, Jericho, New York 11753), Robert Sepersky, M.D. (3511 Creekview Drive, Bonita Springs, Florida 34134-1634), Jonathan Goldman (200 East 90th Street, New York, New York 10128-3527), Ronald Raganella (9 Chuck Hollow Court, Huntington, New York 11743-1350), Robert Mitchell

(338 North Quartz Avenue, Hernando, Florida 34442-3231), William R. Dossenbach (7194 Harbour Town Drive, West Chester, Ohio 45069-6345), Jordan Farkas (1 16th Street, Flagler Beach, Florida 32136), Harvey Schaffler (62 Hofstra Drive, Plainview, New York 11803-1841), Levi C. Purec (545 Forest Hills Drive, Atlanta, Georgia 30342-2335), Timothy J. Klace (3605 West San Luis Street, Tampa, Florida 33629-8711), Kenneth Metviner (1211 Stonecutter Drive, Apt. 503, Kissimmee, Florida 34747-4092), Lawrence Seidman (19 Veteri Place, Wayne, New Jersey 07470-3455), Brad D. Butler (543 Main Street, Westhampton Beach, New York 11978-2400), Richard J. Lashley (415 L'Ambiance Drive, Apt. E-707, Longboat Key, Florida 34228-3908), John H. Merey (5405 Okeechobee Blvd, #302B, West Palm Beach, Florida 33417-4554), Leo M. Goldner (10 Edgewood Drive, Rye Brook, New York 10573-1716), Mark A. Goldstein (118 East Erie Street, Unit 29E, Chicago, Illinois 60611-5152), Michael D. Abneri (94 Regent Drive, Lido Beach, New York 11561-4923), and John Does 1–4 (collectively "Defendants"), and states as follows:

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 4

PARTIES AND RELEVANT NON-PARTIES ......................................................... 7

JURISDICTION AND VENUE ................................................................................. 10

FACTUAL ALLEGATIONS .................................................................................... 11

I.     BACKGROUND .......................................................................................... 11

       A.   Spencer and Mutual Savings Associations Generally ................................. 11

       B.   Spencer's Membership Policy ....................................................................... 12

       C.   Professional Depositors and Mutual Savings Association Conversions ................. 14

       D.   BankInvestor ................................................................................................. 15

       E.   Defendant Seidman's History with Spencer ................................................. 16

II.    THE BANKINVESTOR ENTERPRISE'S HISTORY OF DEFRAUDING SPENCER ......................... 17

       A.   Efforts to Fraudulently Open Spencer Accounts ......................................... 18

       B.   Efforts to Fraudulently Maintain Spencer Accounts .................................... 22

       C.   Fraudulent In-Person Spencer Deposits ....................................................... 24

III.   IN 2021, THE BANKINVESTOR ENTERPRISE JOINS FORCES WITH DEFENDANT SEIDMAN TO FURTHER DEFRAUD SPENCER ................................................................................ 25

       A.   Spencer's 2021 Discovery of Defendants' Concealed Out-of-State Accounts ......... 25

       B.   The BankInvestor Enterprise and Defendant Seidman Coordinate to Fraudulently Reinstate Out-of-State Spencer Accounts. ................................................... 26

            1. False Regulatory Complaints .................................................................. 30

               a.   CFPB Complaints ............................................................................ 30

               b.   NJ DOBI Complaints ...................................................................... 36

            2. False Letters and Emails to Spencer Regarding Account Closures ................. 37

            3. New Jersey State Court Litigation ......................................................... 39

IV.    DEFENDANTS' UNLAWFUL CONDUCT DAMAGED SPENCER ................................................. 43

COUNT I ..................................................................................................................... 44

COUNT II .................................................................................................................... 88

PRAYER FOR RELIEF ............................................................................................. 90

## **INTRODUCTION**

1.      Spencer is a mutual savings association that has served local New Jersey communities for over 130 years. Mutual savings associations have no stockholders, and governance is principally conducted by the board of directors, elected by member-depositors who have a maximum of one vote. Mutual savings associations like Spencer exist for the greater good of the community and not for individual profit. To keep Spencer local, at all times relevant to this lawsuit, Spencer limited member-depositors to those who live or work in New Jersey (and in some instances, Bucks County, Pennsylvania, just across the New Jersey border).

2.      A mutual savings association may convert itself to a stock-issuing entity. When that occurs, eligible member-depositors receive priority subscription rights over all other investors to purchase stock. These rights allow member-depositors of the mutual savings association the first opportunity to buy stock in the new entity.

3.      An unfortunate byproduct of this process has been the emergence of individuals who seek to exploit mutual savings associations (and their member-depositors) by opening and maintaining accounts to take advantage of such conversions—a process known as "seeding." These individuals are known as "professional depositors."

4.      Professional depositors expect mutual savings associations where they have "seeded" accounts to convert to stock-issuing entities, allowing them to obtain discounted shares in the new entity and profit during the initial public offering because the stock price often surges, or "pops," resulting in a substantial value appreciation.

5.      One of the Defendants, Robert Sepersky, outlined in an email both the nefarious purpose of professional depositors and their reasons for "seeding" accounts: "Let's be frank about the motivation for getting these accounts in the first place.... not because of great interest rates or

convenient branches, but because as soon as we walk out of a mutual institution with a deposit account number, we have a claim on the decades of accumulated profit."

6.    Defendants are all professional depositors. All Defendants live and work outside New Jersey except for Defendant Larry Seidman. Together, they schemed to illegally circumvent membership requirements at Spencer and other mutual savings associations nationwide to "seed" and maintain accounts to eventually profit from a stock conversion. As Defendant Robert Mitchell has said, Defendants "have made millions playing this game."

7.    Defendants organized their scheme on BankInvestor—an online, anonymous, members-only message board owned and operated by Defendant BNK Invest. The Defendant members of BankInvestor are associated in fact for the purpose of having out-of-state members obtain and maintain accounts at Spencer and other mutual savings associations in violation of the banks' membership policies (the "BankInvestor Enterprise"). To achieve that purpose, members develop, discuss, and deploy fraudulent and illegal tactics to open and maintain deposit accounts.

8.    Throughout Defendants' operation of, and participation in, the BankInvestor Enterprise, they have committed at least **fifty-two** federal criminal violations defrauding Spencer as detailed herein. Many of these predicate acts allowed Defendants and other BankInvestor Enterprise members to open and maintain non-compliant Spencer accounts for years without detection. This number pales compared to the likely hundreds of federal criminal violations the enterprise committed against other mutual savings associations nationwide.

9.    Defendant Seidman is a notorious New Jersey-based professional depositor who has, against Spencer's wishes, been trying to convert Spencer through various unlawful "activist" tactics, including by attempting to obtain seats on Spencer's Board of Directors. "Over a long career, Mr. Seidman has both succeeded and failed on multiple occasions to alter the behaviors of

Savings and Loan Associations through means including . . . proposing and at times achieving conversion of the entity into a stock-issuing institution." *Seidman v. Spencer Savings Bank*, PAS-C-25-19 (N.J. Super. Ct. Ch. Div. Jul. 31, 2020). Spencer, in particular, is an extremely valuable conversion target because it stands as one of the largest mutual savings associations in the nation, as measured by total deposits and assets.

10.     In 2021, Spencer detected out-of-state accounts that potentially violated the bank's membership policy. The bank sent warning letters to these accountholders stating their accounts would be closed unless they provided proof of New Jersey residency or employment. In response, the BankInvestor Enterprise, Defendant Seidman, and other co-conspirators launched a coordinated wave of new attacks on Spencer to prevent the closure of their out-of-state accounts that violated the membership policy.

11.     The illegal attacks included:  (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing those accounts and other wrongdoing; (2) mailing or emailing false or misleading letters to Spencer protesting the account closures in an attempt to reinstate the accounts; and (3) pooling funds to support bad-faith litigation against Spencer to stop the out-of-state account closures.

12.     The BankInvestor Enterprise and Defendant Seidman both benefited from the conspiracy to defraud Spencer. BankInvestor Enterprise members wanted their accounts reinstated to remain in a position to profit from a conversion of Spencer at the expense of legitimate depositors. Defendant Seidman needed out-of-state professional depositors, including BankInvestor Enterprise members, to provide him with proxy votes to elect himself and other directors to Spencer's board who would then vote to convert the bank to a stock-issuing entity.

13.     The BankInvestor Enterprise's conduct, and later its conspiracy with Defendant Seidman, caused significant harm to Spencer. Spencer has been injured in its business and property by reason of that conduct, including but not limited to incurring damages and expenses related to Spencer's:  (1) payment of interest for decades on non-compliant accounts; (2) review and expulsion of non-compliant account holders; (3) review and response to Defendants' false or misleading federal and state regulatory complaints; and (4) defense against the bad-faith Passaic County lawsuit. Spencer also suffered reputational and goodwill damages. Thus, Spencer is entitled to treble damages, equitable relief to prevent further injury to Spencer by Defendants, and its attorneys' fees and costs.

## PARTIES AND RELEVANT NON-PARTIES

14.     Plaintiff Spencer is a mutual savings association with its principal place of business at 611 River Drive, Elmwood Park, New Jersey 07407. Spencer has served local New Jersey communities with integrity and pride for over 130 years. Spencer offers customers personal and business banking products and services at over twenty financial centers across New Jersey. Spencer has no branches outside of New Jersey.

15.     Defendant BNK Invest, Inc. ("BNK Invest") is a New York corporation with its principal place of business in Jericho, New York. BNK Invest has operated BankInvestor.com ("BankInvestor") at all times relevant to this Complaint.

16.     Defendant Robert Sepersky, M.D. ("Sepersky") is a resident and citizen of Bonita Springs, Florida. Sepersky operates under the alias "cojones" on BankInvestor.

17.     Defendant Jonathan Goldman ("Goldman") is a resident and citizen of New York, New York. Goldman operates under the alias "niceguy" on BankInvestor.

18.     Defendant Ronald Raganella ("Raganella") is a resident and citizen of Huntington, New York. Raganella operates under the alias "poppy5" on BankInvestor.

19.     Defendant Robert Mitchell ("Mitchell") is a resident and citizen of Hernando, Florida. Mitchell operates under the alias "Weasel" on BankInvestor.

20.     Defendant William R. Dossenbach ("Dossenbach") is a resident and citizen of West Chester, Ohio. Dossenbach operates under the alias "doss2" on BankInvestor.

21.     Defendant Jordan Farkas ("Farkas") is a resident and citizen of Flagler Beach, Florida. Farkas operates under the alias "jordan" on BankInvestor.

22.     Defendant Harvey Schaffler ("Schaffler") is a resident and citizen of Plainview, New York. Schaffler operates under the alias "bankonme" on BankInvestor.

23.     Defendant Levi Chitrik Purec ("Purec") is a resident and citizen of Atlanta, Georgia. Defendant Purec operates under the alias "lpurec" on BankInvestor.

24.     Defendant Timothy J. Klace ("Klace") is a resident and citizen of Tampa, Florida. Klace operates under the alias "bailey46" on BankInvestor.

25.     Defendant Kenneth Metviner ("Metviner") is a resident and citizen of Kissimmee, Florida. Metviner operates under the alias "scuttlebut" on BankInvestor.

26.     Defendant Lawrence "Larry" Seidman ("Seidman") is a resident and citizen of Wayne, New Jersey.

27.     Defendant Brad David Butler ("Butler") is a resident and citizen of Westhampton Beach, New York. On information and belief, Butler operates under the alias "BB" on BankInvestor.

28.     Defendant Richard J. Lashley ("Lashley") is a resident and citizen of Longboat Key, Florida. Lashley operates under the alias "bankfund" on BankInvestor.

29.     Defendant John H. Merey ("Merey") is a resident and citizen of West Palm Beach,
Florida. Merey operated under the alias "Supermax2" on BankInvestor.

30.     Defendant Leo M. Goldner ("Goldner") is a resident and citizen of Rye Brook, New
York. Goldner operates under the alias "leog" on BankInvestor.

31.     Defendant Mark A. Goldstein ("Goldstein") is a resident and citizen of Chicago,
Illinois. Goldstein operates under the alias "kingfish848" on BankInvestor.

32.     Defendant Michael D. Abneri ("Abneri") is a resident and citizen of Lido Beach,
New York. Abneri operates under the alias "tmonk2" on BankInvestor.

33.     Defendant John Doe 1 ("Doe 1") is a person of unknown residency and citizenship.
Spencer will attempt to identify Doe 1 through discovery served on Defendants and other third
parties. Doe 1 operates under the alias "gschwab" on BankInvestor.

34.     Defendant John Doe 2 ("Doe 2") is a person of unknown residency and citizenship.
Spencer will attempt to identify Doe 2 through discovery served on Defendants and other third
parties. Doe 2 operates under the alias "plummer" on BankInvestor.

35.     Defendant John Doe 3 ("Doe 3") is a person of unknown residency and citizenship.
Spencer will attempt to identify Doe 3 through discovery served on Defendants and other third
parties. Doe 3 operates under the alias "abukini" on BankInvestor.

36.     Defendant John Doe 4 ("Doe 4") is a person of unknown residency and citizenship.
Spencer will attempt to identify Doe 4 through discovery served on Defendants and other third
parties. Doe 4 operates under the alias "Faith" on BankInvestor.

37.     Certain other non-parties played roles, direct or indirect, in the scheme to defraud
Spencer, including, but not limited to:

        a.      Phillip A. Vasta ("Vasta") is a resident and citizen of New Mexico.

b.      Michael Godby ("Godby") is a resident and citizen of Georgia.

## JURISDICTION AND VENUE

38.    This Court has subject-matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

39.    This Court has personal jurisdiction over Defendants for several reasons:

a.      Each and every Defendant participated in or conspired with the BankInvestor Enterprise to direct activities toward Spencer in New Jersey.

b.      Defendant Seidman is a citizen of New Jersey.

c.      Defendants Sepersky, Goldman, Raganella, Farkas, Schaffler, Butler, Mitchell, Lashley, Klace, Goldner, Dossenbach, Goldstein, Abneri, Metviner, Purec, and Does 1–4 maintained accounts or otherwise transacted business with Spencer in New Jersey.

d.      Defendants BNK Invest, Sepersky, Goldman, Raganella, Farkas, Schaffler, Butler, Mitchell, Lashley, Klace, Goldner, Dossenbach, Goldstein, Abneri, Metviner, Purec, and possibly Does 1–4 reside outside this District and, pursuant to 18 U.S.C. § 1965(b), the Court may cause parties residing in another district to be summoned to the District of New Jersey if the "ends of justice require." As no other district would have personal jurisdiction over all Defendants, the ends of justice require the Court's exercise of personal jurisdiction over these Defendants.

40.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in New Jersey.

41.    Venue is also proper in this Court under 18 U.S.C. § 1965(a) because Defendants reside and/or transact affairs in the District of New Jersey, given each defendant's participation in or conspiracy with the BankInvestor Enterprise to target Spencer in New Jersey. Moreover,

Defendants all have had accounts at Spencer in New Jersey and thus, transacted their affairs in the District.

## FACTUAL ALLEGATIONS

### I. BACKGROUND

### A. Spencer and Mutual Savings Associations Generally

42. From their inception in the nineteenth century, the purpose of mutual savings associations has been to serve local communities without the expectation of profit by any single member. Community banks provide individuals and local businesses with reliable service and a trusted place to keep their savings.

43. Mutual savings associations like Spencer are a subset of community banks. The chartering, operation, structure, and governance of New Jersey mutual savings associations are regulated in substantial part by state law. Still, federal agencies like the Federal Deposit Insurance Corporation ("FDIC") provide oversight and, at times, initiate enforcement actions.

44. As a mutual savings association, Spencer offers accounts to both consumers and businesses at over twenty financial centers throughout New Jersey. Spencer has no branches outside of New Jersey. Spencer focuses its business on serving New Jersey communities by providing individual and institutional customers with an alternative to large banks and financial institutions.

45. Mutual savings associations have no stockholders, and governance is principally conducted by the board of directors elected by savings and borrowing members ("member-depositors"). A member-depositor's interest is limited, and his relationship to the institution is effectively one of creditor to debtor. No member can buy, sell, or profit from a membership interest. As a result, Spencer remains devoted to serving its local member-depositors, rather than the interests of stockholders.

46.    Because state-chartered mutual institutions do not benefit from federal preemption of state banking registration and licensing laws, many mutual savings institutions limit savings membership to individuals residing in their home state.

47.    Federal regulations governing mutual savings associations recognize the importance of limiting benefits to members of the local community that an institution serves. For example, if a mutual savings association decides to convert into a stock-issuing entity, it first "must offer to sell its shares" to "[e]ligible account holders." 12 C.F.R. § 192.320 (establishing the order of priority for the purchase of conversion shares).

**B. Spencer's Membership Policy**

48.    Since at least 1997, Spencer has required that all member-depositors either live or work in New Jersey, or in some specific cases that are not relevant here, Bucks County, Pennsylvania ("Membership Policy"). The Membership Policy applies to all deposit accounts, including checking accounts, money market accounts, savings accounts, individual retirement accounts, and certificates of deposit ("CDs").

49.    The Membership Policy is consistent with Spencer's purpose of servicing local communities in New Jersey.

50.    Allowing out-of-state depositors would also subject a community bank like Spencer to compliance with myriad and ever-changing restrictions, including consumer protection and banking laws, imposed by every state where their member-depositors reside. And compliance would come at a burdensome cost for a community mutual association, which would be forced to assume the same costs typically borne by large interstate banks. Unrestricted membership would also exacerbate the risk of legal liability. Finally, out-of-state membership would not likely yield the normal benefits of a depositor relationship at a community bank like Spencer.

51.     The Membership Policy also guards against out-of-state professional depositors expropriating the value of member subscription rights at the expense of local depositors.

52.     Still, many out-of-state professional depositors employ fraudulent tactics to circumvent membership policies and "seed" accounts to exploit a stock conversion.

53.     Beginning in 2012, Spencer included its Membership Policy in its depositor contracts with members entitled "Terms and Conditions of Your Account" ("T&Cs"). The Membership Policy embedded in the T&Cs since 2012 has provided, in substantially the same form, as follows:

> Spencer Savings Bank establishes deposit accounts with individuals who live or work in the state of New Jersey. Spencer Savings Bank is a community bank. We maintain a policy under which individuals must live or work in the State of New Jersey to open an account with us. We apply this policy also to trusts and other arrangements under which the account is established for the benefit of individuals. Under this policy we instruct our personnel to decline to open accounts for individuals or trusts when the individuals do not meet our policy. We close accounts if the account opening did not conform to our policy. For more information on the termination of accounts, please see "Amendments and Termination."

54.     Consistent with standard banking practice and customer relationships, the Spencer T&Cs state that "[t]his document, along with any other documents we give you pertaining to your account(s) is a contract that establishes rules which control your account(s) with us" and that "[i]f you sign the signature card or open or continue to use the account, you agree to these rules."

55.     The T&Cs also provide that whenever Spencer amends the agreement, any change "supersedes all prior versions and governs your account," and that Spencer expressly reserves the right "to change any term of this agreement." Finally, the T&Cs make clear that "[i]f we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)."

56.     At all times relevant to this lawsuit, Defendants were aware of Spencer's Membership Policy, including the requirement that depositors must live or work in New Jersey to hold accounts at Spencer.

### C. Professional Depositors and Mutual Savings Association Conversions

57.     In contrast to initial public offerings that are typically priced at a new issue discount and usually structured in a way that prevents small individual investors from participating, when a mutual savings association chooses to convert its corporate form into a stock-issuing entity, its member-depositors enjoy a unique opportunity to invest when the bank goes public.

58.     Upon conversion of a mutual bank to a stock-issuing entity, depositors have the first opportunity to buy stock in the new publicly traded company. After the initial subscription period and during the initial public offering, the stock price often surges, or "pops," resulting in a substantial value appreciation for those who opted to purchase stock.

59.     Professional depositors are individuals who seek membership interests in mutual savings associations for the purpose of reaping the benefits of this appreciation in stock value without any desire to establish a normal banking relationship.

60.     Many professional depositors have been "seeding" accounts at mutual savings associations with the expectation that some will convert, resulting in a windfall of valuable stock or, should they sell, money. Seeding involves opening accounts at mutual savings associations across the United States before they convert to stock-issuing entities. And many professional depositors "seed" accounts at mutual savings associations by circumventing in-state eligibility requirements.

61.     Other than BNK Invest, all Defendants are professional depositors who "seeded" accounts at Spencer for the purpose of ultimately benefiting from Spencer converting to a stock-issuing entity.

14

### D. BankInvestor

62.    The Defendant professional depositors worked together in coordination through BankInvestor.

63.    BankInvestor has existed since at least 1998, although its existence and operations were concealed and unknown to Spencer until recently.

64.    On its homepage, BankInvestor describes itself as "the premier online investment club with a focus on mutual conversions and after-market bank investing opportunities."

65.    During the period relevant to this Complaint, there have been approximately 100 active members on BankInvestor.

66.    BankInvestor members post to discussions and message each other using pseudonyms to conceal their true identities. Paragraphs 16–36 list BankInvestor Defendants' aliases.

67.    Defendants Sepersky, Goldman, Raganella, Farkas, Schaffler, Butler, Klace, Goldner, Dossenbach, Goldstein, Abneri, Metviner, Mitchell, Lashley, Merey, Purec, and John Does 1–4 are all current or former members of BankInvestor (collectively, "BankInvestor Defendants"). Spencer has only recently been able to identify BankInvestor Defendants and link them to their aliases. Because of ongoing efforts by the BankInvestor Enterprise to conceal its existence and membership, Spencer has yet to identify several BankInvestor members, some of whom are named as John Doe defendants herein.

68.    To join BankInvestor, a prospective member must first pay a non-refundable application fee. The prospective member can then access the site for 30 days, where active members will observe the prospective member's activity to judge whether he/she should be admitted permanently.

69.     After this 30-day trial period, a subset of active BankInvestor members vote on whether to admit the applicant. BankInvestor members are extremely selective about who they allow to join the site. Current members only admit applicants who can meaningfully contribute to the group's activities, particularly its sharing of information about mutual savings associations. And current members jealously guard the secrecy of their group, emphasizing the importance of not communicating over the phone with applicants.

70.     Once admitted, BankInvestor members can post to a general message board that goes to all members or send direct or group messages to select members.

71.     While BankInvestor is the primary means by which the members communicate, in practice, members also communicate via phone, text message, and email.

**E. Defendant Seidman's History with Spencer**

72.     Defendant Seidman is a notorious professional depositor with a history of profiting substantially from mutual conversions to publicly traded banks through all forms of corporate "activism" both pre- and post-conversion. Defendant Seidman's conquests are well-documented on the SEC Schedule 13D forms he has filed over the years.

73.     For years, Defendant Seidman has been fighting to obtain a seat on Spencer's Board of Directors.

74.     Defendant Seidman's goal is to be elected to Spencer's Board so that he can convert Spencer to a stock-issuing entity, thereby enriching himself.

75.     In 2020, Defendant Seidman initiated a proxy contest to get himself and his ally, Arthur Wein, onto Spencer's Board.

76.     While Defendant Seidman's 2020 candidacy failed, he continued to marshal support for other Spencer Board runs in 2021 and 2022.

16

77.    Defendant Seidman is so committed to the goal of converting Spencer that he once told Defendant Goldman that "he would not ever stop going after Spencer."

## II.    THE BANKINVESTOR ENTERPRISE'S HISTORY OF DEFRAUDING SPENCER

78.    The BankInvestor Enterprise is a group of individuals associated in fact for the purpose of having its out-of-state members obtain and maintain accounts at Spencer and other mutual savings associations in violation of the banks' membership policies.

79.    The BankInvestor Enterprise has operated continuously since at least 1998, when BankInvestor launched online.

80.    The BankInvestor Defendants are all members of the BankInvestor Enterprise.

81.    BNK Invest, as the owner and operator of BankInvestor, is aware of the activities of the BankInvestor Enterprise. BNK Invest's principals actively facilitate the website, which allows BankInvestor Enterprise members to coordinate their unlawful conduct. Moreover, BNK Invest has enabled the Enterprise to conceal its activities and the identities of its members by permitting the use of aliases. BNK Invest's principals also regularly engage on the site under the aliases "admin" and "sysop."

82.    To achieve the BankInvestor Enterprise's purpose, members, including the BankInvestor Defendants, for decades have worked together to develop, hone, and deploy unlawful and fraudulent tactics to "seed" and maintain deposit accounts at Spencer and other mutual savings associations around the United States.

83.    These unlawful tactics include:  (1) obtaining accounts at Spencer and other mutual savings associations to eventually profit from a stock conversion; (2) strategizing and implementing tactics to avoid Spencer and other mutual savings associations discovering their accounts violate the banks' membership policies; and (3) facilitating fraudulent in-person deposits for members who cannot easily travel to New Jersey.

84.     BankInvestor members took great care to conceal these coordinated efforts. Spencer only learned of the long-standing criminal BankInvestor Enterprise and its coordinated conduct to harm Spencer through third-party discovery documents produced in civil litigation by Defendant BNK Invest, Inc. in January 2023.

85.     By way of illustration of the BankInvestor members' interest in concealing their efforts, in an October 11, 2022 BankInvestor post, Defendant Sepersky instructed other BankInvestor Enterprise members to "stay away from emails" when discussing the scheme.

86.     Another BankInvestor Enterprise member, writing under the alias "quant," messaged Defendant Farkas about his concern over being discovered on August 21, 2021: "lets hope . . . [Defendant Sepersky] doesn't get the FBI focused on [BankInvestor] members and how they got their out of state accounts."

**A.  Efforts to Fraudulently Open Spencer Accounts**

87.     BankInvestor Enterprise members frequently discussed ways to fraudulently open accounts at Spencer and other mutual savings associations, including how to circumvent the banks' membership policies to do so.

88.     For example, Defendant Sepersky detailed his scheme to open accounts at out-of-state mutual savings associations using in-state "Mail Boxes Etc." addresses—as opposed to his Massachusetts residence—to BankInvestor Enterprise members in a July 11, 2019 post, stating, "I used Mail Box Etc addresses to open accounts with local addresses in the greater New Orleans area as well as in NJ back in the 1990s. I would use my passport as my ID. Then they changed the Federal law to make private mail drops completely transparent (PMB# denoting private mail box) and I changed my MBE accounts back to MA. In the case of the New Orleans accounts, this was right after Hurricane Katrina, so many of the locals were displaced to out of state relatives etc.

18

Nobody in NJ seemed to care (including Spencer so far!). I have now changed most of my bank addresses to my FL residence, and again, not one seemed to care."

89.    Like Defendant Sepersky, Defendant Merey also used "Mail Boxes Etc." addresses to open his accounts. Despite having never worked or lived in New Jersey, Defendant Merey opened and maintained accounts at Spencer using these private mail drops.

90.    Defendants Farkas and Abneri opted for another strategy, traveling to Spencer branches in or around August 2014 to open new Spencer accounts. In an August 7, 2014, BankInvestor post, they reported to BankInvestor Enterprise members that "the bank will still not accept out-of-state depositors."

91.    Defendant Dossenbach discussed opening accounts via mail or during road trips to avoid providing proper residency information. In an October 18, 2017, BankInvestor post, Defendant Dossenbach wrote, "I was known as the 'mail king' because I found ways to open by mail. The methods no longer work. . . . Many of us did road trips. On driving vacations we did detours. . . . I have accounts at 250 of the remaining thrifts."

92.    On April 11, 2019, Defendant Goldman opened a Spencer CD account based on a New Jersey address that he obtained from a temporary "cold calling job" that he worked part-time for only four weeks for the purpose of obtaining a single paystub to submit to Spencer to open the account. On information and belief, Defendant Goldman shared this strategy with other BankInvestor Enterprise members.

93.    Defendant Lashley admitted in sworn testimony that he accompanied his daughter, Caitlin, and her husband to open an account at Spencer despite the couple legally residing in Texas at the time. The couple used Defendant Lashley's then-current New Jersey address on the account.

94. In a July 19, 2021 BankInvestor post, Defendant Metviner encouraged BankInvestor Enterprise members to use New Jersey addresses of friends and family to open or maintain accounts at Spencer.

95. Defendants all knew that these strategies violated Spencer's Membership Policy. Yet they coordinated and shared information for the express purpose of circumventing those and other rules.

96. BankInvestor Enterprise members also routinely shared strategies for how to "backdoor" into Spencer by opening deposit accounts at banks Spencer planned to acquire that did not yet have residency-based membership policies like Spencer. For example, Defendant John Doe 1, writing under the alias "gschwab," stated in a July 2, 2014 BankInvestor post, "NJM Bank [New Jersey Manufacturers Insurance Company] is not a mutual, but . . . Spencer is a mutual. I was trying to use NJM as a backdoor into Spencer."

97. Defendant Purec likewise discussed BankInvestor Enterprise members obtaining Spencer accounts through the bank's acquisition of Wawel Bank in 2018. On June 18, 2018, Defendant Purec told BankInvestor members in a BankInvestor post: "Got a 'Welcome Wawel Customers' conversion guide from Spencer today in English and Polish. No mention of any purge."

98. When the BankInvestor Enterprise learned that Spencer intended to acquire Mariner's Bank, Defendants strategized on how to use the acquisition to slip into Spencer undetected.

99. Defendant Abneri, in a June 27, 2022 BankInvestor post, discussed opening an account in his wife's name at Mariner's Bank before the Spencer acquisition.

100. On July 18, 2021, Defendant Schaffler discussed opening an account at Mariner's Bank after Mariner's opened an account for his son without issue. He noted in a BankInvestor

20

post: "My son opened an account at Mariners yesterday morning with no problem. I am sure that I can get in as well but your message makes me anxious. I don't think Spencer would venture as far as expelling Mariner's depositors. Either the T-1 date has passed or they will just have to deal with some folks getting in through the back door."

101.    Defendant Goldman echoed this sentiment on July 18, 2021: "For me, I don't want to show myself, either at Spencer or Mariners. If I was you, and you had to do one of them, I would do Mariners."

102.    On July 19, 2021, Defendant Metviner reported to BankInvestor Enterprise members through a BankInvestor post that he "was able to open [an] account[ ] there [Mariner's Bank] today, despite my domicile in Florida. My statements will be mailed to my daughter's address in New Jersey." On August 7, 2021, he posted again to BankInvestor Enterprise members about his scheme to backdoor into Spencer, saying, "I recently opened Mariners, the bank that Spencer is acquiring."

103.    Defendants also coordinated and schemed about how they would prey upon weaker branches and tellers. For example, Defendant Farkas encouraged one BankInvestor member, "quant," on August 1, 2021, through a BankInvestor post, to open an account at "Mariners Bank at 2 Pembroke Place gets you Spencer[.] [T]hey take everyone."

104.    On August 12, 2021, after discussions with Defendant Schaffler, Defendant Goldman opened an account at Mariner's Bank to "backdoor" into Spencer to circumvent the bank's Membership Policy.

105.    On information and belief, BankInvestor Defendants and other BankInvestor Enterprise members discussed and deployed similar schemes and tactics to fraudulently obtain accounts at other mutual savings associations across the United States.

### B. Efforts to Fraudulently Maintain Spencer Accounts

106.    Even more prolific are BankInvestor Defendants' communications about their fraudulent scheme to maintain out-of-state accounts that violated Spencer's Membership Policy.

107.    On March 14, 2012, Defendant Sepersky told BankInvestor Enterprise members in a BankInvestor post to borrow against their Spencer CDs to avoid account closures. Defendant Sepersky suggested that active accounts were less likely to be discovered as violating the Membership Policy.

108.    The next day, on March 15, 2012, Defendant John Doe 2, writing under the alias "plummer," suggested in a BankInvestor post that members should only use Spencer "CD Books" to make a deposit "in person." "Plummer" warned that "[a]ny time you show an OOS [out-of-state] drivers license is like waving a flag."

109.    On May 17, 2012, Defendant Sepersky detailed his tactics to defraud Spencer to members in a BankInvestor post, bragging that he "opened with a NJ address, but changed to OOS over 10 years ago. I have no idea when the last activity was, but have not received a dormant notice and continue to receive my statements. I am afraid to mail in a deposit. I am also afraid to even wire in a deposit, as several dormant accounts that I have wired $$$ into have sent me a personal letter making sure that it was indeed me that wired the money. Showing up at a teller window with some cash for deposit might be the safest??"

110.    That same day, in response to Defendant Sepersky, Defendant Mitchell posted to BankInvestor, "Cojones [Defendant Sepersky] 4 hour drive each way. Go in person. If they ask, tell them your grandmother lives around the corner and you are there to visit her. I had my friend drive 25 miles to a Spencer Bank two weeks ago to update my CDs. I am not losing that account after 20 years and neither should you for 8 hours."

111.    On November 19, 2012, to avoid Spencer's Membership Policy, Defendant Goldman misrepresented his employer during a visit to a Spencer branch in New Jersey and attempted to use a family burial plot in New Jersey to maintain his account.

112.    On November 21, 2012, Defendant Goldman shared his tactics with BankInvestor Enterprise members, including Defendant Farkas, through a BankInvestor post: "I actually went to Spencer this week. In hand was a letter showing my family has had ties to the area since year 1931. My grandparents had ties, but Fitzpatrick [a Spencer employee] didn't care. . . . The letter was from the office of the cemetery where my grandfather in 1931 bought 64 grave sites. I showed them that was the business and relationship I have to the area. I showed the branch manager where I will be buried on the plot. . . . So if anybody is planning on going in there with a letter from a cemetery indicating family ownership since 1931, I am telling you, it won't work."

113.    On November 29, 2012, Defendant John Doe 3, writing under the alias "abukini," told Defendant Farkas in a BankInvestor post, "[i]f your wife's parents still own and live in the NJ home I think you or your wife can go in to the bank and open a joint Cd with one of them. That is what I did when Spencer closed all my accounts with them. I opened a new joint account with my brother who lives close to one of their branches."

114.    Defendant Mitchell passed similar information to Defendant Farkas, encouraging him in a November 30, 2012 BankInvestor post to "change the mailing address on your [Spencer] accounts to your-in-laws [*sic*] in NJ and avoid all these problems."

115.    Defendant Goldman sought guidance from Defendant Schaffler on May 11, 2013, about reinstating his Spencer accounts that were closed in 2012. Defendant Goldman noted in a BankInvestor post that he "tried everything, including going there in person, etc. and they still said

23

no. This one still bothers me because I want it back. Anything you say that could be helpful would be appreciated."

116.    BankInvestor Defendants and other BankInvestor Enterprise members discussed and deployed similar schemes and tactics to fraudulently open and maintain accounts at other mutual savings associations across the United States.

## C.  Fraudulent In-Person Spencer Deposits

117.    BankInvestor Defendants and BankInvestor Enterprise members also organized fraudulent in-person deposits on behalf of members who could not easily travel to New Jersey to circumvent Spencer's Membership Policy.

118.    Because the BankInvestor Enterprise believed that account inactivity could alert Spencer to the illicit nature of their accounts, the BankInvestor Enterprise members periodically deposited small amounts into their Spencer accounts for the purpose of maintaining their fraud on Spencer.

119.    BankInvestor Enterprise members also believed in-person deposits were less likely to trigger an out-of-state account review by Spencer.

120.    In a March 2, 2021 BankInvestor post, Defendant Sepersky admitted having a "very good friend deposit every year in person to not call attention to the OOS address."

121.    That "very good friend" was Defendant Farkas, who made several deposits to Defendant Sepersky's Spencer accounts to avoid closure.

122.    When Defendant Farkas could not make a deposit on Defendant Sepersky's behalf, he asked the BankInvestor Enterprise for help through a post on May 17, 2012.

123.    On information and belief, Defendant Doe 4, who operates on BankInvestor as "Faith," made that 2012 deposit for Defendant Sepersky.

124.    Similarly, on or around August 7, 2014, Defendant Sepersky had Defendant Abneri make a deposit for him at Spencer when Defendant Farkas was unavailable. Defendant Sepersky thanked Defendant Abneri in a BankInvestor post, saying, "my statement acct seems to have survived the purge."

125.    On information and belief, BankInvestor Defendants and other BankInvestor Enterprise members made other fraudulent in-person deposits at Spencer and at other mutual savings associations across the United States to conceal their non-compliance with the banks' membership policies.

### III.    IN 2021, THE BANKINVESTOR ENTERPRISE JOINS FORCES WITH DEFENDANT SEIDMAN TO FURTHER DEFRAUD SPENCER

#### A.    Spencer's 2021 Discovery of Defendants' Concealed Out-of-State Accounts

126.    In or about July 2021, Spencer discovered several hundred out-of-state accounts, including accounts belonging to many Defendants and other BankInvestor Enterprise members, that appeared to have been fraudulently opened or maintained to conceal their non-compliance with the bank's Membership Policy.

127.    In response, Spencer sent warning letters to these individuals, including many Defendants, and closed accounts of individuals who could not prove their compliance with the Membership Policy.

128.    Spencer's warning letters and account closures set off a flurry of activity within the BankInvestor Enterprise.

129.    On August 7, 2021, Defendant Dossenbach notified members through a BankInvestor post that "Spencer is booting again."

130.    The same day, Defendant Sepersky posted on BankInvestor: "Spencer Also Tossing my Ass Out the Door!" He noted "....well, I lasted many years longer than some of you, but I received the letter today."

131.    On August 7–8, 2021, Defendants Mitchell, Metviner, Dossenbach, and Sepersky discussed through BankInvestor posts whether the 2021 account review would impact Mariner's Bank depositors who "backdoored" into Spencer.

132.    On or around August 12, 2021, Defendant Sepersky polled BankInvestor Enterprise members through the website, finding that twenty-one of seventy-five members who responded to the poll received warning letters as of August 12, 2021. On information and belief, Defendant Sepersky designed this poll to identify affected BankInvestor Enterprise members and communicate that impact to Defendant Seidman to show the BankInvestor Enterprise's ability to work in concert to reinstate a significant number of closed accounts.

133.    On August 12, 2021, Defendants Goldman and Mitchell also communicated through BankInvestor posts about fraudulent ways to evade Spencer's account closures.

**B.    The BankInvestor Enterprise and Defendant Seidman Coordinate to Fraudulently Reinstate Out-of-State Spencer Accounts.**

134.    Just after learning of Spencer's August 2021 account review and closures, BankInvestor Enterprise members began scheming with Defendant Seidman and other co-conspirators to avoid out-of-state account closures.

135.    On August 8, 2021, Defendant Sepersky posted to BankInvestor: "Somebody who is in touch with Sir Larry should let him know about a group of new OOS depositors being tossed."

136.    "Sir Larry" was a phrase of endearment BankInvestor members used to refer to Defendant Seidman, whom they closely followed and discussed for years. For example, Defendant Raganella told other BankInvestor members in a February 16, 2021 post that he "received a couple

26

of letters from Sir Larry thanking us for our past support in his bid to be elected to the board for Spencer Savings." In other words, Defendant Seidman was also encouraging and scheming with the BankInvestor Enterprise to support his attempts to convert Spencer.

137.    On or about August 13, 2021, Defendant Sepersky began communicating directly with Defendant Seidman about Spencer's account review. Defendant Sepersky told other BankInvestor Enterprise members through a post: "As you all know, Larry Seidman [has] been embroiled in litigation against Spencer on and off for years. Earlier today, I communicated with him about the results of the poll that I posted on how many individuals on BI have been or will be terminated. I stressed my point to him in an email that I have now presented on this board to you several times. Spencer may make you whole in terms of your principle and even your anticipated interest. But they are not able to make us whole for the loss of our depositor rights in a mutual institution, the loss of our little bit of partial ownership of the many decades of accumulated profit and equity. That we don't have these accounts for the paltry 0.10% interest earned, rather we have them because as soon as we walked out of the bank with a deposit account number, we had a claim to a portion of that bank's equity should it ever be unlocked by a conversion."

138.    On August 17, 2021, Defendant Sepersky updated BankInvestor Enterprise members about his additional conversations with Defendant Seidman.

139.    Defendant Sepersky also relayed information to Defendant Seidman about BankInvestor Enterprise members who had their Spencer accounts closed.

140.    This initial outreach by Defendant Sepersky led to extensive communications between Defendant Seidman, the BankInvestor Enterprise, and other co-conspirators. The communications are reflected in BankInvestor posts, emails, text messages, and extensive phone records subpoenaed in a related litigation against Spencer to stop the out-of-state account closures.

141.    One of the co-conspirators was Vasta. He and Defendant Seidman discussed ways for Vasta, a New Mexico resident, to have his cousin, a New Jersey resident, open a straw account at Spencer. The two spoke extensively over email and telephone. Vasta and Defendant Seidman were constantly communicating, with Vasta parroting the same fraudulent scheme as the BankInvestor Enterprise to reinstate Spencer accounts. This included filing false or misleading federal and state regulatory complaints.

142.    Defendants Mitchell and Seidman also corresponded about ways for Defendant Mitchell, a Florida resident, to maintain his (and his family's) non-compliant Spencer accounts. In a series of emails and phone calls on August 17 and 18, 2021, Defendants Mitchell and Seidman discussed filing a false Consumer Financial Protection Bureau ("CFPB") complaint and mailing a "certified letter" to Spencer, "protesting" the closure of Defendant Mitchell's accounts.

143.    Defendant Seidman likewise contacted Defendant Merey, a Florida resident, and requested Defendant Merey provide him with his Spencer account numbers. In an August 19, 2021 email to Defendant Seidman, Defendant Merey provided the account information for four Spencer accounts he and his family members owned. Despite not living or working in New Jersey, Defendant Merey hoped that providing this information to Defendant Seidman would help reinstate those accounts.

144.    Through their extensive communications, Defendant Seidman, the BankInvestor Enterprise, and other co-conspirators agreed that members of the BankInvestor Enterprise and other co-conspirators would (1) electronically file false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; (2) mail false or misleading letters to Spencer protesting the account closures in an attempt to reinstate their accounts; and (3) fund bad-faith litigation against Spencer to stop the out-of-state account closures.

145.    The conspiracy among the BankInvestor Enterprise, Defendant Seidman, and other co-conspirators had one object:  restoring or maintaining out-of-state Spencer accounts in violation of the bank's Membership Policy.

146.    This object benefited the BankInvestor Enterprise and its co-conspirators. The BankInvestor Enterprise and professional depositor co-conspirators wanted their accounts reinstated to remain in a position to profit from a conversion of Spencer at the expense of legitimate depositors. As Defendant Sepersky explained to Defendant Seidman in an August 13, 2021, email, "[l]et's be frank about the motivation for getting these accounts in the first place.... not because of great interest rates or convenient branches, but because as soon as we walk out of a mutual institution with a deposit account number, we have a claim on the decades of accumulated profit."

147.    Defendant Seidman also benefited from the scheme to defraud Spencer. Defendant Seidman needed out-of-state professional depositors, including BankInvestor Enterprise members, to provide him with proxy votes to elect himself and other directors to Spencer's board who would vote to convert Spencer to a stock-issuing entity. As Defendant Sepersky told Defendant Goldman: "I am sure, in the end, Seidman would give anything to get this bank to convert and walk over to the CEO and say, Fuk you, I won. And I would love to video it."

148.    Defendant Seidman knew that the BankInvestor Enterprise and its co-conspirators were out-of-state professional depositors and that Spencer had a policy restricting depositors to New Jersey residents and workers. Still, Defendant Seidman directed Defendant Metviner to distribute his nomination forms to the BankInvestor Enterprise to inflate his support with votes from unlawfully opened accounts.

149.    Defendant Seidman also knew that professional depositors, including BankInvestor Enterprise members, would be more likely to support his proxy battle and eventual nomination to

Spencer's board. As Defendant Raganella confirmed to BankInvestor Enterprise members on August 18, 2021 post: "Soooo... Guess we can't vote for him [Defendant Seidman] once we are evicted?"

150.    The BankInvestor Enterprise, its co-conspirators, and Defendant Seidman needed to reinstate out-of-state accounts quickly, as Defendant Seidman planned to run again for Spencer's board during the January 2022 elections. Defendant Goldman emphasized this importance to BankInvestor Enterprise members in an August 17, 2021 BankInvestor post.

151.    With their interests aligned, the BankInvestor Enterprise and Defendant Seidman launched a new wave of coordinated attacks on Spencer to prevent the bank from closing out-of-state accounts that were non-compliant with its Membership Policy.

152.    The post-2021 illegal conduct undertaken by the BankInvestor Enterprise and described in detail below was done in coordination with, at the direction of, and/or with the approval of Defendant Seidman.

    1.    <u>False Regulatory Complaints</u>

153.    Defendant Seidman and BankInvestor Enterprise members agreed to submit and did submit false or misleading complaints against Spencer to the CFPB and State of New Jersey Department of Banking and Insurance ("NJ DOBI") in an attempt to reinstate their fraudulent accounts and harm Spencer.

    *a.    CFPB Complaints*

154.    On August 17, 2021, Defendant Sepersky told BankInvestor Enterprise members in a BankInvestor post that he and Defendant Seidman agreed to direct BankInvestor Enterprise members to "file complaint[s] with the Consumer Finance Protection Board at their website cfpb.gov. Scroll down to the File Complaint button. Keep a copy of the complaint which he [Defendant Seidman] requested be forwarded to him to relay to his attorneys. The complaint

should protest the arbitrary nature of the termination after xx years of being a depositor in good faith, that it violates the contract signed at account opening which in no place stated a residency requirement, and the fact that as a mutual depositor, you have certain rights which are not addressed in any manner whatsoever. The first step that the attorneys would pursue is an emergency injunction."

155.    Defendant Mitchell echoed Defendant Sepersky's message, telling BankInvestor Enterprise members in an August 17, 2021 BankInvestor post, "[f]irst step, all depositors that have been notified about a coming purge need to file a complaint with the Consumer Financial Protection Bureau (CFPB). You know the argument, Cojones [Defendant Sepersky] pretty much laid it out."

156.    On August 17, 2021, Defendants Mitchell and Seidman corresponded via email about Defendant Mitchell's false or misleading CFPB complaint. Defendant Mitchell shared his proposed CFPB complaint with Defendant Seidman for his review. Defendant Mitchell thanked Defendant Seidman "for [his] council [*sic*]."

157.    On August 17, 2021, Defendants Goldman and Schaffler discussed filing false CFPB complaints via text messages.

158.    Around this same time, Defendant Lashley communicated with Vasta about filing false CFPB complaints.

159.    On August 18, 2021, Defendant Sepersky shared his false or misleading CFPB complaint with Defendant Seidman via email for Defendant Seidman's review and approval.

160.    On information and belief, after receiving Defendant Seidman's blessing, on August 18, 2021, Defendant Sepersky shared his CFPB complaint with BankInvestor Defendants so others could file similar false complaints.

161.    The false and misleading CFPB and FDIC complaints were all coordinated; they all shared common terms, were similar in form and substance, and were filed at or around the same time.

162.    Through the BankInvestor Enterprise's coordination with Defendant Seidman, at least ten BankInvestor Defendants and co-conspirators electronically submitted false or misleading CFPB or FDIC complaints against Spencer in an attempt to avoid Spencer closing their non-compliant accounts.

163.    Defendant Lashley filed a false or misleading CFPB complaint on August 16, 2021. The complaint falsely alleges Spencer closed out-of-state accounts to benefit bank insiders, including officers and directors. Defendant Lashley shared this complaint via email with Defendant Seidman.

164.    Defendant Dossenbach filed a false or misleading CFPB complaint on August 17, 2021. The complaint falsely stated that Defendant Dossenbach was a good-faith depositor and that Spencer was arbitrarily and improperly closing his Spencer savings account. Defendant Dossenbach knew his account (Dossenbach Account A)[1] was maintained in violation of Spencer's Membership Policy because Defendant Dossenbach did not reside or work in New Jersey.

165.    Defendant Farkas, on behalf of his wife, filed a false or misleading CFPB complaint on August 17, 2021. In the complaint, Defendant Farkas—writing under his wife's name to avoid alerting the bank of his involvement—stated that Spencer arbitrarily closed his IRA account (Farkas Account B). This, despite Defendant Farkas having full knowledge that his account

---

[1] Spencer has omitted Defendants' account numbers in this public filing to avoid inadvertent disclosure of nonpublic personal information in violation of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801–6809, and other applicable banking privacy laws. Spencer will provide the relevant account numbers to the Court and parties upon request or as directed by the Court, subject to appropriate confidentiality procedures.

violated Spencer's Membership Policy, and that neither he nor his wife were eligible for an account at Spencer. Moreover, Defendant Farkas had full knowledge of Spencer's policy, as Spencer had previously informed him of the policy and Defendant Farkas had discussed the policy with BankInvestor Enterprise members since 2012.

166.    Defendant Mitchell filed a false or misleading CFPB complaint on August 17, 2021. The complaint falsely stated that Defendant Mitchell was a good-faith depositor and that Spencer was arbitrarily and improperly closing his seven Spencer accounts. Defendant Mitchell knew that his accounts and those he maintained for his family members (Mitchell Accounts A, B, C, D, E, F, and G) were all maintained in violation of Spencer's Membership Policy because Defendant Mitchell did not reside or work in New Jersey.

167.    Vasta filed a false or misleading CFPB complaint on August 17, 2021. Vasta's complaint falsely stated that he was never advised of Spencer's Membership Policy. Yet at all times, Vasta knew of Spencer's Membership Policy and that, as a New Mexico resident, he did not qualify. Right after filing his false or misleading CFPB complaint, Vasta, through his wife, shared a copy of the complaint with Defendant Seidman.

168.    Defendant Sepersky filed a false or misleading CFPB complaint on August 18, 2021. The complaint included false statements designed to mislead regulators. First, Defendant Sepersky stated that he received Spencer account statements at his home address in Lakeville, MA, since he opened the account. Yet the account opening documents and Defendant Sepersky's statements to BankInvestor members show he opened the account using a Mail Boxes Etc. address in New Jersey. Second, Defendant Sepersky knew Spencer (and other mutual savings associations) had residency requirements, despite his complaint claiming the account was "terminated arbitrarily." Third, as discussed above, Defendant Sepersky had full knowledge of, and worked to

33

evade, Spencer's Membership Policy. Lastly, Defendant Sepersky misrepresented to the CFPB that he agreed when opening his Spencer account to the bank's terms and conditions "as they are now in effect or may after be amended by the Board of Directors of the Association."

169.    Defendant Raganella filed a false or misleading CFPB complaint on August 20, 2021. Thirteen minutes after filing his own CFPB complaint, Defendant Raganella filed the same CFPB complaint on behalf of his adult son, Michael Raganella, without his son's knowledge. Both complaints falsely stated that Defendant Raganella and his son were good-faith depositors, and that Spencer was arbitrarily closing their certificates of deposit. Defendant Raganella knew that he opened his account (Raganella Account A) with an address belonging to a New Jersey public senior living facility with no connection to Defendant Raganella. Defendant Raganella also knew that he opened his son's account (Raganella Account B) with an out-of-state address that did not comply with Spencer's policy and that neither Defendant Raganella nor his son lived or worked in New Jersey.

170.    Defendant Schaffler filed a false or misleading CFPB complaint on August 21, 2021. In the complaint, Defendant Schaffler represented that, in 2012, he provided his "employment information" to the bank to satisfy Spencer's policy. Defendant Schaffler knew this was false, since the employment information he provided to the bank was for a New Jersey nonprofit where he was never employed. Moreover, Defendant Schaffler represented in the complaint that Spencer's Membership Policy was never communicated to him. This was also false, as Defendant Schaffler has, at all times relevant to this Complaint, had full knowledge of Spencer's Membership Policy. Indeed, Defendant Schaffler received a copy of Spencer's Membership Policies in 2004 and 2018. Defendant Schaffler also routinely discussed the policy with the BankInvestor Enterprise.

171.     Defendant Klace mailed a false or misleading FDIC complaint on August 24, 2021. Defendant Klace's complaint falsely suggested that Spencer had knowledge of, and acquiesced to, Defendant Klace's out-of-state residency. This, despite Defendant Klace having full knowledge that he opened his Wawel account (Klace Account A) to evade Spencer's account review process and avoid account closure. Spencer was unaware of Defendant Klace's scheme and never authorized Defendant Klace to maintain his non-compliant account. Moreover, Defendant Klace knew he had previously opened a Spencer account in 2007 (Klace Account B) under false pretenses.

172.     Defendant Purec filed a false or misleading CFPB complaint on August 29, 2021. Aside from a few opening lines, Defendant Purec's complaint was almost a word-for-word copy of Defendant Sepersky's complaint. The complaint falsely stated that Spencer told Defendant Purec that his account would be terminated arbitrarily. Contrary to this representation, Spencer never told Defendant Purec it was arbitrarily terminating his account, but informed Defendant Purec that his account would be terminated if he could not demonstrate that he lived or worked in New Jersey. Defendant Purec had full knowledge that his account was non-compliant, because of the years of BankInvestor posts—some written by Defendant Purec himself—discussing Spencer's policy. Moreover, Defendant Purec's complaint falsely stated that none of his agreements with Spencer included Spencer's right to terminate his account.

173.     On information and belief, other BankInvestor Enterprise members and co-conspirators filed similar false or misleading CFPB or FDIC complaints.

174.     BankInvestor Enterprise members and co-conspirators knew these CFPB or FDIC complaints were false or misleading. BankInvestor Enterprise members knew their accounts violated Spencer's Membership Policy and took steps for years to conceal their non-compliance.

b. *NJ DOBI Complaints*

175. BankInvestor Enterprise members and co-conspirators also conspired with Defendant Seidman to electronically submit, and did so submit, false or misleading complaints to the NJ DOBI in an attempt to avoid Spencer closing their accounts.

176. Vasta and Defendant Sepersky discussed filing false or misleading NJ DOBI complaints. Vasta instructed Defendant Sepersky on how to file a NJ DOBI complaint so that Defendant Sepersky could share the information with the BankInvestor Enterprise and "bombard the [agency] with complaints."

177. Defendant Mitchell filed a false or misleading NJ DOBI complaint on September 29, 2021. The complaint falsely stated that Defendant Mitchell was a good-faith depositor and that Spencer was arbitrarily and improperly closing his seven Spencer accounts. Defendant Mitchell knew that his accounts and those he maintained for his family members (Mitchell Accounts A, B, C, D, E, F, G) were all maintained in violation of Spencer's Membership Policy because Defendant Mitchell did not reside or work in New Jersey.

178. Vasta filed a false or misleading NJ DOBI complaint on August 17, 2021. The complaint falsely stated that Vasta "was never advised of the residency requirement, nor to my knowledge was it ever previously attempted to be enforced." Yet at all times, Vasta knew Spencer had a Membership Policy and knew he did not qualify as a New Mexico resident.

179. On information and belief, other BankInvestor Enterprise members and co-conspirators filed similar false or misleading NJ DOBI complaints.

180. BankInvestor Enterprise members and co-conspirators knew these NJ DOBI complaints were false or misleading. BankInvestor Enterprise members knew their accounts violated Spencer's Membership Policy and took steps for years to conceal their non-compliance.

36

Yet BankInvestor Enterprise members falsely claimed they opened and maintained their Spencer accounts in good faith.

    2.   <u>False Letters and Emails to Spencer Regarding Account Closures</u>

181.    Defendant Sepersky, in coordination with Defendant Seidman, also instructed BankInvestor Enterprise members through a BankInvestor post to send certified letters through the United States mail to Spencer saying they have "filed a formal complaint to the CFPB" and protesting their account closures. These intimidation tactics were designed to force Spencer to reinstate out-of-state accounts even though the accounts violated Spencer's Membership Policy.

182.    On August 18, 2021, Defendant Sepersky shared a draft of his certified letter to Spencer with Defendant Seidman via email. Defendant Sepersky's letter contains false or misleading statements, including that his savings account has been "in good standing for over 25 years." This statement is false, as Defendant Sepersky knew his account violated Spencer's Membership Policy and that he had opened the account with a Mail Boxes Etc. address.

183.    On information and belief, Defendant Sepersky emailed his certified letter to Defendant Seidman for Defendant Seidman's review and approval.

184.    On August 18, 2021, Defendant Mitchell likewise asked Defendant Seidman via email if he should write and send a certified letter to Spencer protesting the threatened closure of his accounts. On information and belief, Defendant Seidman encouraged Defendant Mitchell to write and send a false or misleading letter to Spencer.

185.    Through the BankInvestor Enterprise's conspiracy with Defendant Seidman, at least four BankInvestor Enterprise members wrote and sent false or misleading letters to Spencer in an attempt to avoid account closure.

186.    Defendant Sepersky mailed a false or misleading letter to Spencer using the U.S. mail on August 18, 2021. Despite knowing his Spencer account (Sepersky Account A) violated the

bank's Membership Policy and was opened with a Mail Boxes Etc. address, Defendant Sepersky falsely stated in the letter that he properly opened his Spencer account, was a good-faith depositor and that Spencer was closing his certificate of deposit account arbitrarily.

187.    Defendant Dossenbach mailed a false or misleading letter to Spencer using the U.S. mail on August 18, 2021. Despite knowing his Spencer account (Dossenbach Account A) violated the bank's Membership Policy, Defendant Dossenbach falsely stated in the letter that he properly opened his Spencer account, was a good-faith depositor and that Spencer was closing his savings account arbitrarily.

188.    Defendant Raganella mailed a false or misleading letter to Spencer using the U.S. mail on August 20, 2021. Despite knowing his Spencer account (Raganella Account A) violated the bank's Membership Policy, Defendant Raganella claimed his account closure was "arbitrary and capricious," and Spencer was stealing his "theoretical ownership of a portion of the institution's equity."

189.    Defendant Schaffler mailed a false or misleading letter to Spencer using the U.S. mail on August 23, 2021. Defendant Schaffler's letter falsely represented that he worked at New Jersey Blood Services, a New Jersey nonprofit. Defendant Schaffler knew his representations to the bank were false, as he did not work for New Jersey Blood Services.

190.    On information and belief, other BankInvestor Enterprise members and co-conspirators sent similar false or misleading letters and/or emails to Spencer using the U.S. mail to avoid their account closures.

191.    BankInvestor Enterprise members and co-conspirators knew these letters and/or emails were false or misleading. BankInvestor Enterprise members knew their accounts violated Spencer's Membership Policy and took steps for years to conceal their non-compliance. Yet

BankInvestor Enterprise members falsely claimed they opened and maintained their Spencer accounts in good faith.

3.  New Jersey State Court Litigation

192.    Defendants Seidman and Sepersky also agreed to recruit, and did so recruit, members of the BankInvestor Enterprise to join and help fund litigation against Spencer in Passaic County, New Jersey.

193.    The Passaic County litigation was premised on creating a false narrative about Spencer's Membership Policy to conceal BankInvestor Enterprise members' decades-long campaign to open and maintain accounts that violated the bank's Membership Policy.

194.    Defendant Seidman also worked with another co-conspirator, Godby—Defendant Seidman's longtime broker, specializing in converted thrifts—to identify Godby's clients who could serve as plaintiffs in the Passaic County lawsuit.

195.    On August 20, 2021, Defendant Sepersky wrote in a BankInvestor post to BankInvestor Enterprise members, "Larry called me this AM. His lawyers feel that there isn't enough evidence of dismissed depositors having taken a realized loss to establish damages and therefore they were unwilling to pursue the case on a contingency basis. There is still an excellent chance that an unlawful breach of contract case could prevail, perhaps even with an emergency injunction to stop expulsions. But it would require a group of us on BI [BankInvestor] and presumably an equally large or larger group of Godby clients not on BI to front some money, perhaps $3,000 apiece to pursue this. . . . I told Larry that this could be far worse than herding cats. But he said, probably correctly, that if Spencer . . . succee[ds] in these expulsions, that nothing would stand in the way of other mutuals in NJ and across the country of doing similar OOS account terminations. While I certainly would be willing to make an investment like this, I think it would be difficult to organize and carry out... thoughts, everybody?"

196.    Defendant Sepersky pushed for Godby, Defendant Seidman, and the BankInvestor Enterprise to join forces in their campaign against Spencer, informing BankInvestor Enterprise members through another BankInvestor post that Godby "SAID THAT SEIDMAN'S EFFORT HAS HIS BLESSING." At that time, Defendant Sepersky was "discussing with Godby about how to get his clients involved and participating as well." And Defendant Sepersky informed the BankInvestor Enterprise when Godby "reached out to his clients for the names of clients that ha[d] been tossed from Spencer."

197.    Defendant Seidman also conspired with Defendant Goldman around the same time. On August 20, 2021, Defendant Goldman wrote to BankInvestor Enterprise members in a post, "I spoke with Larry today, and can confirm what cojones [Defendant Sepersky] said. . . . He [Defendant Seidman] told me to call him on Monday for an update, and that he would follow through with cojones [Defendant Sepersky] as well."

198.    On August 23, 2021, Defendant Sepersky again encouraged BankInvestor Enterprise members to join the lawsuit in a BankInvestor post, claiming that "[Seidman] does warn that if we do not try to fight this forcefully, 'we deserve what we get.'"

199.    On August 30, 2021, Defendants Sepersky and Abneri discussed litigation against Spencer in a series of private BankInvestor posts. Defendant Abneri agreed to review retainer agreements for Defendant Sepersky related to the litigation and discussed attending litigation strategy phone calls.

200.    On September 1, 2021, Defendant Sepersky directed a BankInvestor post to Defendant Dossenbach:  "Doss, Seidman called... he is trying to get a head count of people who are in . . . said he had spoken with you. I am in for the money certainly... give much more every

congressional cycle!, although haven't decided whether to be an unnamed plaintiff. Are you going to join the lawsuit?"

201.    On September 1, 2021, Defendant Goldner posted to BankInvestor Enterprise members that he "emailed Brody [Seidman's attorney] to throw in $2500 to sue for starters...If we EVER want to contest the arbitrary actions of any bank in dumping us out we will NEVER have a better opportunity than this one….. Go for the gusto and thankyou [*sic*] cojo [Defendant Sepersky] for running with the ball."

202.    Defendants Goldner and Sepersky corresponded with other BankInvestor Enterprise members about the litigation against Spencer throughout 2021 and 2022 via BankInvestor and phone. Throughout this time, Defendant Goldner applauded Defendant Sepersky's leadership regarding the Spencer litigation and encouraged other BankInvestor Enterprise members to join the litigation.

203.    On September 29, 2021, Defendant Sepersky told Defendant Goldner in a BankInvestor post that he contributed $5,000 because "Seidman promised I could have him on speed dial forever."

204.    In October and December 2021, Defendants Goldstein and Sepersky discussed Defendant Goldstein joining or funding the litigation against Spencer.

205.    In a December 19, 2024 BankInvestor post, Defendant Metviner discussed mailing a $3,000 check to fund the litigation against Spencer because of Defendant Sepersky's "leadership."

206.    Defendant Abneri also discussed the Passaic County litigation directly with Defendant Seidman via phone calls. Defendant Sepersky put the two in contact after emailing

Defendant Abneri on December 20, 2021, saying, "Larry Seidman [wants] to talk to you." Defendant Abneri also contributed to funding the Passaic County litigation by January 11, 2022.

207.    In March 2022, Defendant Butler corresponded with Defendant Sepersky and other BankInvestor Enterprise members, promising to "continue to support Jan Brody [Seidman's attorney] in the Spencer litigation as [he] did in November with [his] check book."

208.    Defendant Seidman also conspired with Vasta to join the Passaic County litigation.

209.    In total, records confirm that Defendant Seidman was in direct contact—either by telephone or email—with at least twenty individuals involved in the conspiracy against Spencer, including Defendants Sepersky, Goldman, Mitchell, Lashley, Schaffler, Farkas, Klace, Abneri, Purec, and Raganella. Defendant Seidman also had direct contact with co-conspirators Vasta and Godby.

210.    On information and belief, Defendant Seidman directly contacted, or was contacted by, additional co-conspirators and members of the BankInvestor Enterprise related to efforts to defraud Spencer.

211.    Between coordination with BankInvestor Enterprise members, clients from Godby, and Defendant Seidman's personal associates, at least twenty-two professional depositors contributed to Defendant Seidman's Passaic County lawsuit against Spencer. Most proceeded as "unnamed" plaintiffs so that they could not be identified as professional depositors or inadvertently reveal the existence of the BankInvestor Enterprise. Many of the professional depositors who contributed to the litigation were members of the BankInvestor Enterprise.

212.    Defendants Lashley and Mitchell were named plaintiffs in the Passaic County lawsuit and caused the filing of the bad-faith verified complaint in that case.

213.     Defendant Seidman and BankInvestor Enterprise members also conspired to defeat federal removal jurisdiction in the Passaic County litigation. In a December 24, 2021, BankInvestor post, Defendant Sepersky told Defendant Goldstein that Defendant Seidman "joined the case for strategic reasons (preventing the bank from trying to move the case to Federal courts)."

214.     As discussed above, Spencer could not have learned, and did not learn, of the coordination between the BankInvestor Enterprise and Defendant Seidman until it was revealed in discovery in related litigation in 2023.

## IV.    DEFENDANTS' UNLAWFUL CONDUCT DAMAGED SPENCER

215.     Due to Defendants' scheme to defraud Spencer and unlawful conspiracy, Spencer has been damaged in its business or property by being forced to incur significant expenses related to (1) reviewing out-of-state accounts, expelling non-compliant account holders, and responding to Defendants' false and/or bad-faith protests; (2) reviewing and responding to false or misleading federal and state regulatory complaints; and (3) defending against Defendants' bad-faith Passaic County litigation, even though the litigation should never have been instituted.

216.     Spencer has also been damaged in its business or property by virtue of having paid interest on Defendants' fraudulently opened and/or maintained accounts.

217.     Finally, Spencer has incurred damages to its reputation and goodwill by reason of Defendants' illegal conduct.

## COUNT I
## RICO Violation Under 18 U.S.C. § 1962(c)
## Against Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner

218.    Spencer expressly incorporates its allegations in the foregoing paragraphs as if fully restated herein.

219.    18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees."

220.    Spencer is a "person" as defined in 18 U.S.C. § 1961(3) because it is an entity capable of holding, and does hold, a legal or beneficial interest in property.

221.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

222.    Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner are all "persons" as defined in 18 U.S.C. § 1961(3) because each is an individual or entity capable of holding, and does hold, a legal or beneficial interest in property.

### The BankInvestor Enterprise

223.    The BankInvestor Enterprise is a group of individuals associated in fact for the purpose of having its out-of-state members obtain and maintain accounts at Spencer and other mutual savings associations in violation of the banks' membership policies. BankInvestor Defendants are all members of the BankInvestor Enterprise. The BankInvestor Enterprise engaged

in a multi-faceted campaign of lies, fraud, and misrepresentations to open and maintain accounts at Spencer and other mutual savings associations in violation of the banks' membership policies.

224.    The BankInvestor Enterprise organized its operation into a cohesive group with common responsibilities, tactics, and goals throughout the United States.

225.    In addition to general private discussion boards, the BankInvestor Enterprise managed and operated private subgroups and chats on BankInvestor. These groups were organized to facilitate strategy discussions on, among other things, which banks to target, account opening techniques, and tactics for evading detection. Many of the subgroups and chats were dedicated to defrauding Spencer, in particular.

226.    The BankInvestor Enterprise has adapted its scheme to changing circumstances, avoiding attempts by Spencer to identify and close their fraudulent accounts. Before 2021, the BankInvestor Enterprise primarily organized secretly to open and maintain accounts at Spencer that violated the bank's Membership Policy. Most of the Enterprise's activities were focused on hiding their out-of-state account statuses from Spencer. After 2021, when Spencer closed many BankInvestor Enterprise members' accounts, the Enterprise shifted its focus to reinstating closed accounts and maintaining members' accounts that had not been closed.

227.    Over that same period of time, BankInvestor Defendants, BankInvestor Enterprise members, and their co-conspirators recruited, reviewed, and approved new members to the BankInvestor Enterprise, expanding the scope and nature of their activities.

228.    The BankInvestor Enterprise has benefited from the participation in and leadership of the Enterprise's affairs by the following Defendants:

a.    **Defendant Sepersky** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the

overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; (2) mailing or transmitting via email false or misleading letters to Spencer protesting the account closures; and (3) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Sepersky also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

b.    **Defendant Goldman** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; (2) mailing or transmitting via email false or misleading letters to Spencer protesting the account closures; and (3) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Goldman also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

c.    **Defendant Raganella** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; (2) mailing or transmitting via email false or misleading letters to Spencer protesting the account closures; and (3) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures.

d.      **Defendant Mitchell** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; and (2) organizing funds for and participating as a plaintiff in bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Mitchell also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

e.      **Defendant Dossenbach** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; and (2) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Dossenbach also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

f.      **Defendant Farkas** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; and (2) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Farkas also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across

47

the United States. Defendant Farkas further authored an internal BankInvestor publication titled "Dog Partners Conversion Research," which regularly provides intelligence on mutual savings associations nationwide.

g.     **Defendant Schaffler** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts, and (2) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Schaffler also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

h.     **Defendant Purec** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; and (2) organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Purec also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

i.     **Defendant Klace** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including: (1) electronically filing false complaints with federal and state regulators accusing Spencer of arbitrarily closing their accounts; and (2) organizing funds for bad-

faith litigation against Spencer to stop the out-of-state account closures. Defendant Klace also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

j.    **Defendant Metviner** has been responsible for participating in, coordinating, and directing other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise, including organizing funds for bad-faith litigation against Spencer to stop the out-of-state account closures. Defendant Metviner also frequently coordinated false or misleading tactics used by the BankInvestor Enterprise to obtain or maintain accounts at Spencer and other similarly situated mutual savings associations across the United States.

229.    At all relevant times, Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner conducted or participated in the conduct, operations, management, and/or affairs of the BankInvestor Enterprise, as outlined throughout this Complaint.

230.    At all relevant times, the BankInvestor Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

231.    Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner conducted or participated, directly or indirectly, in the conduct, operations, management, and/or affairs of the BankInvestor Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

232.    **Defendant Sepersky** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a. <u>Predicate Act 1</u>: On or about May 11, 2012, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the Bank. In furtherance of that scheme or artifice to defraud, Defendant Sepersky transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post that encouraged BankInvestor members to borrow against their Spencer CDs to avoid detection and/or account closure. Defendant Sepersky transmitted this post to induce Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer unnecessarily paid monthly interest on non-compliant accounts and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

b. <u>Predicate Act 2</u>: On or about May 17, 2012, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Defendant Sepersky's out-of-state Spencer account (Sepersky Account A), which violated Spencer's Membership Policy. In furtherance of that scheme or artifice to defraud, Defendant Sepersky mailed checks to Defendant Farkas to deposit in person at Spencer branches on behalf of Defendant Sepersky to avoid Spencer learning that Defendant Sepersky's account did not comply with the bank's Membership Policy. As a result of Spencer's

reliance on Defendant Sepersky's scheme, Spencer unnecessarily paid monthly interest on Defendant Sepersky's non-compliant account and was forced to spend employee hours on account maintenance, investigation, and compliance. Defendant Sepersky transmitted this post to induce Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. This conduct violated 18 U.S.C. § 1341.

c.     <u>Predicate Act 3</u>:  On or about May 31, 2012, Defendant Sepersky knowingly executed or attempted to execute a scheme or artifice to defraud Spencer by having Doe Defendant 4, known in the BankInvestor Enterprise as "Faith," make deposits at a Spencer branch to avoid Spencer learning that Defendant Sepersky's account (Sepersky Account A) violated the bank's Membership Policy. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer unnecessarily paid monthly interest on Defendant Sepersky's non-compliant account and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

d.     <u>Predicate Act 4</u>:   On or about August 7, 2014, Defendant Sepersky knowingly executed or attempted to execute a scheme or artifice to defraud Spencer by having Defendant Abneri make deposits at a Spencer branch to avoid Spencer learning of Defendant Sepersky's account (Sepersky Account A), which violated the bank's Membership Policy. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer unnecessarily paid monthly interest on Defendant Sepersky's non-compliant account and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

e.     Predicate Act 5:  On or about August 17, 2021, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Sepersky transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post that encouraged BankInvestor Enterprise members to (1) file false CFPB complaints; (2) send false letters or emails to Spencer to try to prevent account closure; (3) organize funds for bad-faith litigation against Spencer to stop the out-of-state account closures; and (4) conspire with Defendant Seidman to defraud the bank. Defendant Sepersky transmitted this post to induce Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, compliance, and costs related to responding to regulatory inquiries. This conduct violated 18 U.S.C. § 1343.

f.     Predicate Act 6:  On or about August 18, 2021, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or

artifice to defraud, Defendant Sepersky transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, an email to Defendant Seidman with a copy of his CFPB complaint containing false allegations for Defendant Seidman's review and approval. This coordination was intended to ensure that BankInvestor Enterprise members submitted unified CFPB complaints to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity, including Defendant Sepersky, and responding to federal regulators. This conduct violated 18 U.S.C. § 1343.

g.    Predicate Act 7:  On or about August 18, 2021, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Sepersky transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post with a copy of his CFPB complaint containing false or misleading allegations to encourage other members to file similar false or misleading complaints. This coordination was intended to ensure that BankInvestor Enterprise members submitted unified CFPB complaints to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor

Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity and responding to federal regulators. This conduct violated 18 U.S.C. § 1343.

        h.     <u>Predicate Act 8</u>:  On or about August 18, 2021, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Sepersky transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a complaint to the CFPB containing false or misleading allegations. The complaint falsely stated that Defendant Sepersky was a good-faith depositor and that his account was closed arbitrarily. Defendant Sepersky knew his account was opened with an out-of-state address that did not comply with Spencer's Membership Policy. Defendant Sepersky submitted the complaint to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Sepersky's actions, Spencer was forced to spend employee hours investigating Defendant Sepersky's account activity and responding to federal

regulators in a letter that Spencer transmitted to the FDIC on September 16, 2021. This conduct violated 18 U.S.C. § 1343.

   i. <u>Predicate Act 9</u>:  On or about August 18, 2021, Defendant Sepersky and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Sepersky mailed a letter to Spencer, including false or misleading statements. Despite knowing his Spencer account (Sepersky Account A) violated the bank's Membership Policy, Defendant Sepersky falsely stated in the letter that he properly opened his Spencer account, was a good-faith depositor and that Spencer was closing his certificate of deposit account arbitrarily. As a result of Spencer's reliance on Defendant Sepersky's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1341.

  233. **Defendant Goldman** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

   a. <u>Predicate Act 1</u>:  On or about November 19, 2012, Defendant Goldman travelled from New York to New Jersey to visit a Spencer branch to knowingly execute or attempt to execute a scheme or artifice to defraud Spencer by protesting his account closures. Defendant Goldman tried to convince Spencer that his family had "ties to the area" because of a cemetery plot in New Jersey his grandfather purchased, and thus his accounts (Goldman Accounts A, B, and C) satisfied Spencer's Membership Policy. During the visit, Defendant Goldman presented Spencer with a letter from Marge Nagel at Cedar Park & Beth El Cemeteries in Westwood, New

Jersey, with information about the "Goldman Family Circle," which consisted of 64 grave sites. Defendant Goldman's scheme was intended to defraud Spencer into not closing Defendant Goldman's accounts. As a result of Spencer's reliance on Defendant Goldman's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

      b.    <u>Predicate Act 2:</u>  On or about April 11, 2019, Defendant Goldman travelled from New York to New Jersey and opened an account (Goldman Account D) at a Spencer branch. At this point, Defendant Goldman's other Spencer accounts were terminated for non-compliance with Spencer's Membership Policy. Thus, Defendant Goldman knew that he did not satisfy Spencer's Membership Policy. Still, on or about April 11, 2019, Defendant Goldman knowingly executed or attempted to execute another scheme or artifice to defraud Spencer by misrepresenting his employment to open an account. Defendant Goldman listed a New Jersey subscription service, East Inc. Sales, as his employer. Yet Defendant Goldman only worked at East Inc. Sales for a few weeks to obtain a single paystub to defraud Spencer into opening another account. As a result of Spencer's reliance on Defendant Goldman's scheme, Spencer was fraudulently induced to open a new account for Defendant Goldman; paid interest on that account; and incurred account maintenance, investigation, and compliance costs. This conduct violated 18 U.S.C. § 1344.

      c.    <u>Predicate Act 3</u>:  On or about July 18, 2021, Defendant Goldman and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to open deposit accounts at Spencer. In furtherance of that scheme or artifice to defraud, Defendant Goldman transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post encouraging BankInvestor Enterprise members to open

accounts at Mariner's Bank as a way to "backdoor" into Spencer, because Spencer announced it was acquiring Mariner's Bank. Defendant Goldman knew Spencer's Membership Policy would not allow out-of-state accounts and that Mariner's Bank accounts would be subject to that policy when the acquisition was completed. As a result of Defendant Goldman's scheme, Spencer unnecessarily paid monthly interest on non-compliant Mariner's Bank accounts belonging to BankInvestor Enterprise members when the acquisition was completed and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

        d.    <u>Predicate Act 4</u>:  On or about August 12, 2021, Defendant Goldman and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Goldman transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to Defendant Mitchell discussing a scheme to defraud Spencer into not closing Defendant Mitchell's accounts. The two discussed a plan to submit a false CFPB complaint and send false or misleading letters to Spencer to avoid account closure. As a result of Spencer's reliance on Defendant Goldman's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

        e.    <u>Predicate Act 5</u>:  On or about August 12, 2021, Defendant Goldman knowingly executed or attempted to execute another scheme or artifice to defraud Spencer by opening an account at Mariner's Bank (Goldman Account E) to obtain a Spencer account.

Defendant Goldman knew that Spencer was acquiring Mariner's Bank and that his Mariner's Bank account would become a Spencer account. Defendant Goldman also knew that his Mariner's Bank account would soon be subject to Spencer's Membership Policy and knew that he did not satisfy Spencer's Membership Policy. Defendant Goldman managed to defraud Spencer as his Mariner's account was transferred to Spencer. As a result of Spencer's reliance on Defendant Goldman's scheme, Spencer paid interest on Defendant Goldman's Mariner's Bank account and incurred account maintenance, investigation, and compliance costs. This conduct violated 18 U.S.C. § 1344.

234.    **Defendant Raganella** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.    <u>Predicate Act 1</u>: On or about August 6, 2014, Defendant Raganella devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Raganella's out-of-state certificate of deposit account (Raganella Account B) that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Raganella sent a letter to Spencer under the name of his adult son, Michael Raganella, to avoid the escheatment of his account funds to the state of New Jersey. Michael Raganella was wholly unaware of the account's existence, as Defendant Raganella unilaterally opened and maintained the account to increase the amount of stock he could purchase in the event of Spencer's mutual to stock conversion. Defendant Raganella sent this letter to induce Spencer to maintain the custodial account, despite Defendant Raganella's full knowledge that he opened and maintained the account in violation of Spencer's policy and that Michael Raganella was an adult for whom a custodial account was unlawful under the New Jersey Uniform Transfers to Minors Act, N.J. Stat. Ann. §§ 46:38A-1, *et seq*. As a result of Spencer's reliance on

Defendant Raganella's false representations, Spencer unnecessarily paid monthly interest on the account and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1341.

       b.    <u>Predicate Act 2</u>:  On or about June 26, 2015, Defendant Raganella devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Raganella's out-of-state account that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Raganella mailed a custodial passbook savings account booklet to Spencer's River Drive office to induce the bank to update and post interest to the account. The beneficiary for the account was Defendant Raganella's adult son, Michael Raganella, who was wholly unaware of the account's existence. Defendant Raganella improperly opened the account, over which he exercised exclusive control, to reap further benefits from a mutual to stock conversion. Defendant Raganella mailed the passbook to induce Spencer to update the account interest, despite Defendant Raganella's knowledge that the account was opened in violation of Spencer's policy and that Michael Raganella was an adult for whom a custodial account was improper. As a result, Spencer maintained the account, unknowingly paid monthly interest to the account for six more years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1341.

       c.    <u>Predicate Act 3</u>:  On or about August 3, 2020, Defendant Raganella devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Raganella's out-of-state account that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Defendant Raganella transmitted or caused to be transmitted, by means of wire communication in

interstate or foreign commerce, a telephone call to Spencer's customer service center in response to an inactivity notice from the bank. Defendant Raganella made this call to induce the bank to remove his custodial certificate of deposit account—which was fraudulently opened in the name of his then (and now) adult son, Michael Raganella, and under Defendant Raganella's exclusive control—from inactive status so that the bank would not escheat the account funds to the state. Michael Raganella was wholly unaware of the existence of the account. Defendant Raganella intended to trick Spencer into maintaining the certificate of deposit, despite Defendant Raganella's knowledge that he opened and maintained the account in violation of Spencer's policy and that Michael Raganella was an adult for whom a custodial account was improper. As a result, Spencer did maintain the account and unknowingly continued to pay Defendant Raganella interest. Spencer was further forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

        d.    <u>Predicate Act 4</u>: On or about August 20, 2021, Defendant Raganella devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Raganella transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to the CFPB through the agency's online complaint submission portal. The complaint falsely stated that Defendant Raganella was a good-faith depositor and that Spencer was arbitrarily closing his certificate of deposit account. Defendant Raganella knew that he opened an account (Raganella Account A) with an address belonging to a New Jersey public senior living facility without a connection to Defendant Raganella. Defendant Raganella submitted the complaint to

induce federal regulators to force Spencer to maintain BankInvestor accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion at the expense of legitimate Spencer depositors. As a result of Defendant Raganella's actions, Spencer was forced to spend employee hours investigating Defendant Raganella's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 20, 2021. This conduct violated 18 U.S.C. § 1343.

e.    <u>Predicate Act 5</u>: On or about August 20, 2021, Defendant Raganella devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Raganella transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a complaint to the CFPB under fraudulent pretenses. Defendant Raganella fraudulently filed the complaint in the name of his son, Michael Raganella, who was wholly unaware that Defendant Raganella filed the complaint or that Defendant Raganella had used his identity to protest the closure of the custodial certificate of deposit (Raganella Account B). Defendant Raganella used the agency's online complaint submission portal to submit the regulatory complaint. The complaint falsely stated that Defendant Raganella—who falsely represented that he was Michael Raganella—was a good-faith depositor and that his account was being closed arbitrarily. Defendant Raganella knew the account was opened with an out-of-state address that did not comply with Spencer's policy and that neither Defendant Raganella nor his son lived or worked in New Jersey. Defendant Raganella submitted

the complaint to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Raganella's actions, Spencer was forced to spend employee hours investigating Defendant Raganella's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 20, 2021. This conduct violated 18 U.S.C. § 1343.

   f. <u>Predicate Act 6</u>:  On or about August 20, 2021, Defendant Raganella and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Raganella mailed a false or misleading letter to Spencer on August 20, 2021. Despite knowing his Spencer account (Raganella Account A) violated the bank's Membership Policy, Defendant Raganella claimed his account closure was "arbitrary and capricious," and Spencer was stealing his "theoretical ownership of a portion of the institution's equity." As a result of Spencer's reliance on Defendant Raganella's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1341.

   235. **Defendant Mitchell** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

   a. <u>Predicate Act 1</u>:  On or about April 29, 2012, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud

Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members encouraging members to "[k]eep a very low profile" at Spencer to defraud the bank. Defendant Mitchell also urged members to use "a NYC address," which he described as "certainly safer than FL, IL, OH." Defendant Mitchell transmitted this post to help the BankInvestor Enterprise evade Spencer's detection so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts, unknowingly paid monthly interest to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

   b. <u>Predicate Act 2</u>:  On or about May 1, 2012, Defendant Mitchell knowingly executed or attempted to execute a scheme or artifice to defraud Spencer by having an unnamed "friend" make deposits at a Spencer branch to avoid Spencer learning that Defendant Mitchell and his family members accounts (Mitchell Accounts A, B, C, D, E, F, and G) violated the bank's Membership Policy. Defendant Mitchell bragged about this practice in a May 17, 2012 BankInvestor post that included Defendant Sepersky. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer unnecessarily paid monthly interest on Defendant

Mitchell's non-compliant accounts and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

      c.    <u>Predicate Act 3</u>:  On or about May 17, 2012, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members encouraging Defendant Sepersky to drive "4 hour[s]" from Massachusetts to a Spencer branch in New Jersey to provide Spencer with false information to maintain his out-of-state account. Specifically, Defendant Mitchell wrote, "tell them [Spencer] your grandmother lives around the corner and you are there to visit her." Defendant Mitchell knew this information was false and knew it would mislead Spencer. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts—including an account (Sepersky Account A) belonging to Defendant Sepersky—unknowingly paid monthly interest to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

      d.    <u>Predicate Act 4</u>:  On or about May 26, 2012, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or

artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members encouraging Defendant Schaffler to "do all [his] Spencer banking in person, like you do work nearby." Defendant Mitchell knew that Defendant Schaffler did not work in New Jersey and that this scheme would defraud Spencer. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts—including accounts (Schaffler Accounts A, B, and C) belonging to Defendant Schaffler and his family members—unknowingly paid monthly interest to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

   e. <u>Predicate Act 5</u>:  On or about November 30, 2012, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members encouraging Defendant Farkas to "change the mailing address on your accounts to your-in-laws [*sic*] in NJ and avoid all these problems." Defendant Mitchell knew Defendant Farkas did not live in New Jersey with his in-laws and knew it would mislead Spencer. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts—including an account (Farkas Account A) belonging to Defendant Farkas' wife, Janet Seltzer, which he maintained—unknowingly paid monthly interest

to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

      f.   <u>Predicate Act 6</u>:  On or about August 12, 2021, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members setting forth a plan to defraud Spencer into reinstating out-of-state accounts slated for closure. Specifically, Defendant Mitchell said he will first return Spencer's check closing the account "with a certified letter addressed to the top guy at the bank, advising him that my depositor rights have been stolen and demanding that my accounts be reinstated." If the check is returned, he will send it back with another certified letter. Next, if the bank returns the check a third time, he will "call the bank's regulator and make the usual argument, always without success, but it makes work for the bank and the regulator (and we all know how civil servants like to do extra work)." Finally, if all of that failed, Defendant Mitchell would send another certified letter to the bank advising it that "when the Bank finally decides to IPO (and one day they will), I threaten that I will hold up their IPO by suing in court." As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity, including Defendant Mitchell, and responding to federal regulators and fraudulent complaints. This conduct violated 18 U.S.C. § 1343.

g.  Predicate Act 7:  On or about August 17, 2021, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to BankInvestor Enterprise members encouraging them to file false or misleading CFPB complaints following Defendant Sepersky's sample complaint. This coordination was intended to ensure that BankInvestor Enterprise members submitted unified CFPB complaints to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of the Spencer board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity and responding to federal regulators. This conduct violated 18 U.S.C. § 1343.

h.  Predicate Act 8:  On or about August 17, 2021, Defendant Mitchell and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted or caused to be transmitted, by means of wire

communication in interstate or foreign commerce, an email to Defendant Seidman with a copy of his CFPB complaint containing false allegations for Defendant Seidman's review and approval. This coordination was intended to ensure that BankInvestor Enterprise members submitted unified CFPB complaints to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Mitchell's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity and responding to federal regulators. This conduct violated 18 U.S.C. § 1343.

        i.    <u>Predicate Act 9</u>: On or about August 17, 2021, Defendant Mitchell devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to the CFPB through the agency's online complaint submission portal. The complaint falsely stated that Defendant Mitchell was a good-faith depositor and that Spencer was arbitrarily and improperly closing his seven Spencer accounts. Defendant Mitchell knew that his accounts and those he maintained for his family members (Mitchell Accounts A, B, C, D, E, F, and G) were all maintained in violation of Spencer's Membership Policy because Defendant Mitchell did not reside or work in New Jersey. Still, Defendant Mitchell submitted his CFPB complaint to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that

the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Mitchell's actions, Spencer was forced to spend employee hours investigating Defendant Mitchell's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on October 4, 2021. This conduct violated 18 U.S.C. § 1343.

       j.    <u>Predicate Act 10</u>:  On or about September 24, 2021, Defendant Mitchell devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Mitchell transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to NJ DOBI through the agency's online complaint submission portal. The complaint falsely stated that Defendant Mitchell was a good-faith depositor and that Spencer was arbitrarily and improperly closing his seven Spencer accounts. Defendant Mitchell knew that his accounts and those he maintained for his family members (Mitchell Accounts A, B, C, D, E, F, and G) were all maintained in violation of Spencer's Membership Policy because Defendant Mitchell did not reside or work in New Jersey. Still, Defendant Mitchell submitted his NJ DOBI complaint to induce state regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Mitchell's actions, Spencer was forced to spend employee

hours investigating Defendant Mitchell's account activity and responding to state regulators in a letter that Spencer transmitted to NJ DOBI on October 5, 2021. This conduct violated 18 U.S.C. § 1343.

236.    **Defendant Dossenbach** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.    <u>Predicate Act 1</u>:  On or about April 30, 2012, Defendant Dossenbach and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Dossenbach transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members detailing his scheme to defraud Spencer and advising other BankInvestor Enterprise members how to do the same. Specifically, Defendant Dossenbach wrote, "I seldom update books. I use bill pay to send deposits every 5 to 9 months depending on institution. When I used to mailed [*sic*] in may [*sic*] 200 books invariably one or two would be lost. Replacing the books was a hassle. They would say 'Stop by a branch.' Dah I am out of town. Then notarized forms. Lost a couple because 'We have to open a new account and cannot because we no longer open out of area.'" As a result of Spencer's reliance on Defendant Dossenbach's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts, unknowingly paid monthly interest to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

b.    <u>Predicate Act 2</u>:  On or about June 7, 2012, Defendant Dossenbach and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Dossenbach transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members telling members, including "mag900" to "carry [his] passport and us [*sic*] that for ID" to avoid providing identification that showed his current address. As a result of Spencer's reliance on Defendant Dossenbach's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts, unknowingly paid monthly interest to those accounts for approximately nine years, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

c.    <u>Predicate Act 3</u>:  On or about August 17, 2021, Defendant Dossenbach and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Dossenbach transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to BankInvestor Enterprise members encouraging them to file false or misleading CFPB complaints following Defendant Sepersky's sample complaint. Specifically, Defendant Dossenbach shared his false or misleading CFPB complaint wording, which repeated false claims that Defendant Dossenbach was

71

a "good faith" Spencer depositor and protested his account's "arbitrary" closure. This coordination was intended to ensure that BankInvestor Enterprise members submitted unified CFPB complaints to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Defendant Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Spencer's reliance on Defendant Dossenbach's scheme, Spencer was forced to spend employee hours investigating BankInvestor Enterprise members' account activity and responding to federal regulators. This conduct violated 18 U.S.C. § 1343.

        d.    <u>Predicate Act 4</u>:  On or about August 17, 2021, Defendant Dossenbach devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Dossenbach transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to the CFPB through the agency's online complaint submission portal. The complaint falsely stated that Defendant Dossenbach was a good-faith depositor and that Spencer was arbitrarily and improperly closing his Spencer savings account. Defendant Dossenbach knew his account (Dossenbach Account A) was maintained in violation of Spencer's Membership Policy because Defendant Dossenbach did not reside or work in New Jersey. Still, Defendant Dossenbach submitted his CFPB complaint to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers

to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Dossenbach's actions, Spencer was forced to spend employee hours investigating Defendant Dossenbach's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 16, 2021. This conduct violated 18 U.S.C. § 1343.

        e.      <u>Predicate Act 5</u>:  On or about August 18, 2021, Defendant Dossenbach and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Dossenbach mailed a letter to Spencer, including false or misleading statements. Despite knowing his Spencer account (Dossenbach Account A) violated the bank's Membership Policy, Defendant Dossenbach falsely stated in the letter that he properly opened his Spencer account, was a good-faith depositor and that Spencer was closing his savings account arbitrarily. As a result of Spencer's reliance on Defendant Dossenbach's scheme, Spencer was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1341.

        237.   **Defendant Farkas** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

        a.      <u>Predicate Act 1</u>:  On or about May 17, 2012, Defendant Farkas devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Defendant Sepersky's out-of-state certificate of deposit account (Sepersky Account A) that violated Spencer's

Membership Policy. In furtherance of that scheme to defraud, Defendant Farkas entered a Spencer branch and presented himself as Defendant Sepersky to deposit money into Defendant Sepersky's account. Defendant Farkas did this to prevent the bank from discovering that Defendant Sepersky's account did not comply with Spencer's Membership Policy. At all times, Defendant Farkas knew that he was purposefully misleading the bank and that Defendant Sepersky was not eligible for an account at Spencer. As a result of Defendant Farkas' fraud, Spencer unnecessarily paid monthly interest to Defendant Sepersky's non-compliant account (Sepersky Account A) and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

        b.    <u>Predicate Act 2</u>:  On or about August 7, 2014, Defendant Farkas devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure Spencer could not identify or close Defendant Sepersky's out-of-state certificate of deposit account (Sepersky Account A) that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Defendant Farkas entered a Spencer branch—accompanied by Defendant Abneri—and presented himself as Defendant Sepersky to deposit a twenty-dollar check to Defendant Sepersky's account. Defendant Sepersky had sent this check to Defendant Farkas to deposit on Defendant Sepersky's behalf. Defendant Farkas made this deposit to generate activity on Defendant Sepersky's account and prevent the bank from discovering that Defendant Sepersky's account did not comply with Spencer's Membership Policy. At all times, Defendant Farkas knew that he was purposefully misleading the bank and that Defendant Sepersky was not eligible for an account at Spencer. As a result of Defendant Farkas' fraud, Spencer unnecessarily paid monthly interest on Defendant Sepersky's non-compliant

account (Sepersky Account A) and was forced to spend employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1344.

       c.    <u>Predicate Act 3</u>:  On or about December 31, 2017, Defendant Farkas devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to obtain illicit proceeds from a mutual to stock conversion and ensure Spencer could not identify or close BankInvestor Enterprise accounts that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Defendant Farkas transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post urging members of the BankInvestor Enterprise to attend the Spencer Savings annual meeting. Defendant Farkas further urged any BankInvestor attendee to report back to the Enterprise on any relevant news obtained from the meeting. Multiple BankInvestor Enterprise members did in fact attend the meeting at Defendant Farkas' request, and "Stockmaven" reported back to the group on the events that transpired. At all times, Defendant Farkas was aware that many BankInvestor Enterprise members maintained non-compliant Spencer accounts and thus were ineligible to attend the annual meeting. Defendant Farkas also knew of the Enterprise's objective to elect Defendant Seidman and convert Spencer, and took this action in furtherance of that objective. This conduct violated 18 U.S.C. § 1343.

       d.    <u>Predicate Act 4</u>:  On or about March 14, 2019, Defendant Farkas devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to obtain illicit proceeds from a mutual to stock conversion and ensure Spencer could not identify or close BankInvestor Enterprise accounts that violated Spencer's Membership Policy. In furtherance of that scheme to defraud, Defendant Farkas transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a

BankInvestor post urging members of the BankInvestor Enterprise to vote against Spencer's proposed charter conversion to a New Jersey mutual savings association. This, despite Defendant Farkas knowing that BankInvestor Enterprise members maintained non-compliant accounts at Spencer and were therefore not lawfully eligible to vote on the proposal. Defendant Farkas transmitted this post because, if Spencer adopted the new charter, it would make it more difficult for Defendant Seidman to seize control of the bank and force a conversion. At all times, Defendant Farkas was aware of the Enterprise's objective to elect Defendant Seidman and convert Spencer and took this action in furtherance of that objective. Defendant Farkas transmitted this post so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the non-compliant accounts; (2) preserve their Spencer depositor voting numbers to vote for Defendant Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. This conduct violated 18 U.S.C. § 1343.

   e. <u>Predicate Act 5</u>:  On August 17, 2021, Defendant Farkas devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises, representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Farkas transmitted, caused to be transmitted, by means of wire communication in interstate commerce, a fraudulent complaint to the CFPB through the agency's online complaint submission portal. In the complaint, Defendant Farkas—writing under his wife's name to avoid alerting the bank of his involvement—stated that Spencer arbitrarily closed his IRA account (Farkas Account B). This, despite Defendant Farkas having full knowledge that his account violated Spencer's Membership Policy, and that neither he nor his wife were eligible for an account at Spencer. Moreover, Defendant Farkas had full knowledge of Spencer's

policy, as Spencer had previously informed him of the policy and Defendant Farkas had discussed the policy with BankInvestor Enterprise members since 2012. Defendant Farkas submitted the complaint to induce federal regulators to force Spencer to maintain BankInvestor Enterprise members' accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Farkas' actions, Spencer was forced to spend employee hours investigating Defendant Farkas' account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 14, 2021. This conduct violated 18 U.S.C. § 1343.

238.    **Defendant Schaffler** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.    Predicate Act 1:  On or around May 12, 2012, Defendant Schaffler devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises, representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme, Defendant Schaffler mailed a letter in interstate commerce from his home in New York to Spencer Savings Bank in New Jersey, falsely representing that he worked at New Jersey Blood Services, a New Jersey nonprofit. Moreover, Defendant Schaffler formatted this letter on letterhead falsely indicating that he worked for New Jersey Blood Services, stating, "I have prepared this letter on my company's New Jersey [*sic*] just to illustrate our strong presence in New Jersey." Defendant Schaffler knew at the time that his representation was false, since on the same day, he was communicating with the BankInvestor Enterprise to devise ways to keep his account

at Spencer open. Defendant Schaffler sent this letter so that he and the BankInvestor Enterprise could: (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Schaffler's actions, Spencer was forced to spend employee hours investigating Defendant Schaffler's account activity. This conduct violated 18 U.S.C. § 1341.

b.    Predicate Act 2:   On or around February 1, 2019, Defendant Schaffler devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme, Defendant Schaffler opened a certificate of deposit account (Schaffler Account D), representing to the bank that New Jersey Blood Services, a New Jersey-based nonprofit, employed him. Defendant Schaffler knew his representations to the bank were false, as he did not work for New Jersey Blood Services. Defendant Schaffler opened the account so that he and the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Schaffler's actions, Spencer was forced to spend employee hours investigating Defendant Schaffler's account activity. This conduct violated 18 U.S.C. § 1344.

c.    Predicate Act 3:   On August 21, 2021, Defendant Schaffler devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of

that scheme or artifice to defraud, Defendant Schaffler transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to the CFPB. In the complaint, Defendant Schaffler represented that, in 2012, he provided his "employment information" to the bank to satisfy Spencer's policy. Defendant Schaffler knew this was false, since the employment information he provided to the bank was for a New Jersey nonprofit where he was never employed. Moreover, Defendant Schaffler represented in the complaint that Spencer's Membership Policy was never communicated to him. This was also false, as Defendant Schaffler has, at all times relevant to this Complaint, had full knowledge of Spencer's Membership Policy. Indeed, Defendant Schaffler received a copy of Spencer's Membership Policies in 2004 and 2018. Defendant Schaffler also routinely discussed the policy with the BankInvestor Enterprise. Defendant Schaffler submitted the complaint to induce federal regulators to force Spencer to maintain BankInvestor accounts so that the BankInvestor Enterprise could (1) continue to collect interest on the accounts; (2) preserve their Spencer depositor numbers to vote for Seidman's takeover of Spencer's board; and (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Schaffler's scheme, Spencer was forced to spend employee hours investigating Schaffler's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 24, 2021. This conduct violated 18 U.S.C. § 1343.

d.    <u>Predicate Act 4</u>:    On August 23, 2021, Defendant Schaffler devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme, Defendant Schaffler mailed a letter in interstate commerce from his home in New York to Spencer Savings Bank in New Jersey, falsely representing that he worked at New Jersey

Blood Services, a New Jersey nonprofit. Defendant Schaffler knew his representations to the bank were false, as he did not work for New Jersey Blood Services. Defendant Schaffler sent this letter so that he and the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Schaffler's actions, Spencer was forced to spend employee hours investigating Defendant Schaffler's account activity. This conduct violated 18 U.S.C. § 1341.

239.    **Defendant Purec** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.    <u>Predicate Act 1</u>:  On March 14, 2019, Defendant Purec devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help enable Defendant Seidman's takeover of Spencer's board. In furtherance of that scheme or artifice to defraud, Defendant Purec transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce a BankInvestor post to Defendant Farkas relaying Defendant Seidman's desire that the BankInvestor Enterprise vote against Spencer's initiative to change its governing structure to a mutual savings association. Defendant Purec knew that BankInvestor Enterprise members maintained non-compliant accounts at Spencer and were therefore not lawfully eligible to vote on the proposal. Defendant Purec transmitted this post because, if Spencer adopted the new charter, it would make it more difficult for Defendant Seidman to seize control of the bank and force a conversion. At all times, Defendant Purec was aware of the Enterprise's objective to elect Defendant Seidman and convert Spencer and took this action in furtherance of that objective. This conduct violated 18 U.S.C. § 1343.

80

   b. <u>Predicate Act 2</u>:  On August 29, 2021, Defendant Purec devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Purec transmitted, caused to be transmitted, by means of wire communication in interstate or foreign commerce, a fraudulent complaint to the CFPB. Defendant Purec used the CFPB's online complaint submission portal to submit the regulatory complaint. The complaint falsely stated that Spencer told him his account would be terminated arbitrarily. Contrary to this representation, Spencer never told Defendant Purec it was arbitrarily terminating his account, but informed Defendant Purec that his account would be terminated if he could not demonstrate that he lived or worked in New Jersey. Defendant Purec had full knowledge that his account was non-compliant, because of the years of BankInvestor posts—some authored by Defendant Purec himself—discussing Spencer's policy. Moreover, Defendant Purec's complaint falsely stated that none of his agreements with Spencer included Spencer's right to terminate his account. Finally, Defendant Purec's complaint was a near word-for-word copy of Defendant Sepersky's CFPB complaint submitted days earlier. Defendant Purec submitted the complaint to induce federal regulators to force Spencer to maintain BankInvestor accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Purec's actions, Spencer was forced to spend employee hours investigating Defendant Purec's account activity and responding to federal regulators in a letter that Spencer transmitted to the FDIC on September 20, 2021. This conduct violated 18 U.S.C. § 1343.

240.    **Defendant Klace** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.      <u>Predicate Act 1</u>:  On or around February 2, 2007, Defendant Klace devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme, Defendant Klace opened an account (Klace Account B) at Spencer under false pretenses under the name of a fake New Jersey business called "Adel Dawson of New Jersey LP." Defendant Klace provided the bank with the address of 61 Sawmill Road, Lebanon, NJ—an address to which he had no connection. Defendant Klace created the sham business "Adel Dawson" days before—on or around January 26, 2007—to give the appearance of legitimacy to his purported connection with New Jersey. Defendant Klace used this fake business to open deposit accounts at New Jersey mutuals without being detected, and, at all times relevant to this Complaint, Defendant Klace knew his representations to Spencer to be false. Defendant Klace opened the account so that he and the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Klace's actions, Spencer was forced to spend employee hours investigating Defendant Klace's account activity. This conduct violated 18 U.S.C. § 1344.

b.      <u>Predicate Act 2</u>:  On or around October 31, 2007, Defendant Klace devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of

that scheme, Defendant Klace opened a 5-year certificate of deposit at Spencer (Klace Account C) and listed Adel Dawson LP—which he represented was a New Jersey business—as his employer. In fact, Defendant Klace was a certified public accountant working in Florida in his own practice. Defendant Klace has never worked in New Jersey, and at all times knew he was not eligible for an account at Spencer. Defendant Klace opened the account so that he and the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Klace's actions, Spencer was forced to spend employee hours investigating Defendant Klace's account activity. This conduct violated 18 U.S.C. § 1344.

        c.     <u>Predicate Act 3</u>:  On November 11, 2017, Defendant Klace devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme, Defendant Klace opened a 60-month certificate of deposit account at Wawel Bank to improperly obtain an account at Spencer Bank. At all times, Defendant Klace knew that he was not qualified for an account at Spencer, but he still sought to deceive the bank during Spencer's acquisition of Wawel Bank. Defendant Klace believed that Spencer would not discover his account after the acquisition. Defendant Klace opened the account so that he and the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve out-of-state voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Klace's actions,

Spencer was forced to spend employee hours investigating Defendant Klace's account activity. This conduct violated 18 U.S.C. § 1344.

        d.    <u>Predicate Act 4</u>:  On August 24, 2021, Defendant Klace devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor members' accounts that violated Spencer's Membership Policy were not identified and closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Klace mailed from his home in Tampa, Florida, to the FDIC office in Kansas City, Missouri, a false and misleading regulatory complaint against Spencer. The FDIC received the complaint at its office on August 31, 2021. Defendant Klace's complaint falsely suggested that Spencer had knowledge of, and acquiesced to, Defendant Klace's out-of-state residency. This, despite Defendant Klace having full knowledge that he opened his Wawel account (Klace Account A) to evade Spencer's account review process and avoid account closure. Spencer was unaware of Defendant Klace's scheme and never authorized Defendant Klace to maintain his non-compliant account. Moreover, Defendant Klace knew he opened his previous 2007 Spencer account (Klace Account B) under false pretenses. Defendant Klace submitted the FDIC complaint to induce federal regulators to force Spencer to maintain BankInvestor accounts so that the BankInvestor Enterprise could (1) continue to improperly collect interest on the accounts; (2) preserve their Spencer depositor voting numbers to vote for Seidman's takeover of Spencer's board; and, ultimately, (3) unlawfully profit from a mutual to stock conversion. As a result of Defendant Klace's actions, Spencer was forced to spend employee hours investigating Defendant Klace's account activity and responding to federal regulators. This conduct violated 18 U.S.C. § 1341.

241.    **Defendant Metviner** engaged in the following related and continuous criminal acts in furtherance of the BankInvestor Enterprise's objectives:

a.    <u>Predicate Act 1</u>:  On or about February 11, 2021, Defendant Metviner and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Metviner transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor Enterprise members telling members, including "stockmaven" that Spencer closed Defendant Farkas' account after he changed his mailing address with the bank to Florida. Thus, "stockmaven" should speak with Defendant Farkas before updating his mailing address at Spencer. As a result of Spencer's reliance on Defendant Metviner's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts, unknowingly paid monthly interest to those accounts, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

b.    <u>Predicate Act 2</u>:  On or about July 19, 2021, Defendant Metviner and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Metviner transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to other BankInvestor

Enterprise members telling members that he was "able to open accounts" at Mariner's Bank, a bank Spencer planned to acquire, despite his "domicile in Florida." Defendant Metviner also noted that he had his statements mailed to his daughter in New Jersey to avoid detection by Spencer once Spencer acquired Mariner's Bank. Defendant Metviner intended this message to encourage other BankInvestor Enterprise members to open fraudulent accounts at Mariner's Bank to "backdoor" into Spencer, as other BankInvestor Enterprise members discussed. As a result of Spencer's reliance on Defendant Metviner's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts that were opened at Mariner's Bank, unknowingly paid monthly interest to those accounts, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

c.    Predicate Act 3:  On or about October 23, 2021, Defendant Metviner and other BankInvestor Enterprise members and co-conspirators devised a scheme or artifice to defraud Spencer of money or property by means of false or misleading promises or representations to help ensure out-of-state BankInvestor Enterprise members' accounts that violated Spencer's Membership Policy were not identified or closed by the bank. In furtherance of that scheme or artifice to defraud, Defendant Metviner transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, a BankInvestor post to "banconit1" to open an account at Mariner's Bank to backdoor into Spencer. Defendant Metviner noted that he opened an account at Mariner's Bank and "[s]o far, so good." Defendant Metviner intended this message to encourage "banconit1" to open a fraudulent account at Mariner's Bank for the purpose of "backdooring" into Spencer, as other BankInvestor Enterprise members discussed. As a result of Spencer's reliance on Defendant Metviner's scheme, Spencer maintained out-of-state BankInvestor Enterprise accounts that were opened at Mariner's Bank, unknowingly paid monthly

interest to those accounts, and spent employee hours on account maintenance, investigation, and compliance. This conduct violated 18 U.S.C. § 1343.

242.    Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner have engaged in multiple predicate acts, as described in Paragraphs 232–41. The conduct of each predicate act described in Paragraphs 232–41 is both related and continuous, and constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

243.    Indeed, the conduct is continuous because each predicate act—both individually and collectively to the BankInvestor Enterprise—is separated from at least one other predicate act by less than 10 years, and the conduct has occurred over a substantial period of time. Given the BankInvestor Enterprise's continued operation and the substantial activity, the threat of continued unlawful activity still lingers against Spencer, as well as against other mutual savings associations across the United States.

244.    The predicate acts are also related because the acts targeted the same victim (Spencer), used identical or similar methods of commission, involved the same participants, were advanced for the same purposes, were organized through the same medium, BankInvestor, and were committed at or around the same time.

*Spencer's Injuries*

245.    Spencer was injured in its business and/or property by reason of Defendants Sepersky's, Goldman's, Raganella's, Mitchell's, Dossenbach's, Farkas's, Schaffler's, Purec's, Klace's, and Metviner's violations of 18 U.S.C. § 1962(c). The injuries to Spencer caused by reason of the violations of Section 1962(c) include, but are not limited to, interest paid on accounts that violated Spencer's Membership Policy, and expenses associated with (1) investigation of and correspondence about out-of-state accounts, expulsion of non-compliant account holders, and

response to Defendants' unjustified protests; (2) investigation, response, and compliance costs related to Defendants' false or misleading federal and state regulatory complaints; and (3) defense against the bad-faith Passaic County lawsuit. Spencer also suffered reputational and goodwill damages.

246.    Spencer's injuries were the direct, proximate, and reasonably foreseeable result of Defendants Sepersky's, Goldman's, Raganella's, Mitchell's, Dossenbach's, Farkas's, Schaffler's, Purec's, Klace's, and Metviner's violations of 18 U.S.C. § 1962(c). Spencer is the ultimate victim of the Defendants' unlawful conduct. Spencer has been and will continue to be injured in its business and property in an amount to be determined at trial.

247.    Under 18 U.S.C. § 1964(c), Spencer is entitled to recover treble damages and its costs and attorneys' fees from Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner.

248.    Spencer is also entitled to, and should be awarded, an order enjoining Defendants Sepersky, Goldman, Raganella, Mitchell, Dossenbach, Farkas, Schaffler, Purec, Klace, and Metviner, their assignees, and anyone else acting in concert with them, including, but not limited to all Defendants named herein, from taking any other illegal, fraudulent, or misleading actions to restore their non-compliant Spencer accounts.

## COUNT II
## Conspiracy to Violate RICO Under 18 U.S.C. § 1962(d)
## Against All Defendants

249.    Spencer expressly incorporates its allegations in the foregoing paragraphs as if fully restated herein.

250.    18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefore in any appropriate United

States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fees."

251.   Spencer is a "person" as defined in 18 U.S.C. § 1961(3) because it is an entity capable of holding, and does hold, a legal or beneficial interest in property.

252.   18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

253.   Defendants are all "persons" as defined in 18 U.S.C. § 1961(3) because each Defendant is an individual or entity capable of holding, and does hold, a legal or beneficial interest in property.

254.   Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(d), as described above, in violation of 18 U.S.C. § 1962(d).

255.   Defendants knew they were engaged in a conspiracy to commit unlawful predicate acts, knew that the predicate acts were part of such racketeering activity, and knew the participation and agreement of each of them was necessary to allow the commission of the pattern of racketeering activity.

256.   Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operations of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

257.   Defendants knew about and agreed to facilitate the BankInvestor Enterprise's scheme to defraud Spencer. Part of that scheme involved Defendants agreeing that they and/or their co-conspirators would commit a pattern of racketeering activity, as set forth in Paragraphs 232–41. The predicate acts described herein were undertaken for the common purpose of

fraudulently opening, maintaining, or avoiding closure of out-of-state Spencer accounts, violating the bank's Membership Policy.

258.    As a direct and proximate result of Defendants' conspiracy, the BankInvestor Enterprise's racketeering activity, the acts in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Spencer has been injured in its business and property, including incurring damages related to Spencer's:  (1) review of out-of-state accounts, explosion of non-compliant account holders, and response to Defendants' unjustified protests; (2) review and response to Defendants' false or misleading federal and state regulatory complaints; and (3) defense against the bad-faith Passaic County litigation. Spencer also suffered reputational and goodwill damages.

259.    Under 18 U.S.C. § 1964(c), Spencer is entitled to recover treble damages, costs, and attorneys' fees from Defendants.

260.    Spencer is also entitled to, and should be awarded, an order enjoining Defendants, their assignees, and anyone else acting in concert with them, including, but not limited to all Defendants named herein, from taking any other illegal, fraudulent, or misleading actions to restore their non-compliant Spencer accounts.

261.    Spencer is also entitled to, and should be awarded, an order enjoining Defendant Seidman from taking further illegal, fraudulent, or misleading actions in an attempt to obtain a seat on Spencer's Board of Directors.

## **PRAYER FOR RELIEF**

WHEREFORE, Spencer respectfully requests that the Court enter judgment against Defendants and grant the following relief:

1.  Finding that all Defendants are jointly and severally liable for all damages caused to Spencer;

2. Awarding Spencer monetary damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

3. Awarding Spencer prejudgment interest according to statute;

4. Awarding Spencer an order enjoining Defendants, their assignees, and anyone else acting in concert with them, including, but not limited to, all Defendants named herein, from taking any other illegal, fraudulent, or misleading actions to restore their non-compliant Spencer accounts;

5. Awarding Spencer an order enjoining Defendant Seidman from taking further illegal, fraudulent, or misleading actions in an attempt to obtain a seat on Spencer's Board of Directors;

6. Awarding Spencer its reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

7. Awarding Spencer any other relief the Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Spencer hereby demands a jury trial on all issues triable by jury.

Dated: May 6, 2025                                    TROUTMAN PEPPER LOCKE LLP


/s/ *Joseph N. Froehlich*
Joseph N. Froehlich
305 Church at North Hills Street
Suite 1200
Raleigh, NC 27609
(919) 578-6337
joseph.froehlich@troutman.com

OF COUNSEL:

Stephen J. Obermeier (*pro hac vice* forthcoming)
Frank Scaduto (*pro hac vice* forthcoming)
Corey J. Hauser (*pro hac vice* forthcoming)
Isaac J. Wyant (*pro hac vice* forthcoming)
**Wiley Rein LLP**
2050 M Street NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049

*Counsel for Plaintiff Spencer Savings*
*Bank S.L.A.*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Litigation is pending between Spencer and Defendants Mitchell, Lashley, Seidman, and Merey in the Superior Court of New Jersey, Passaic County (Docket No. C-108-21), and between Spencer and Defendants Mitchell, Lashley, and Merey in the District of New Jersey (Docket No. 2:21-cv-20485). Both cases involve additional parties not named herein and are based on different claims. No litigation exists between Spencer and any of Defendants BNK Invest, Inc., Robert Sepersky, Jonathan Goldman, Ronald Raganella, Jordan Farkas, Harvey Schaffler, Brad D. Butler, Timothy J. Klace, Leo M. Goldner, William R. Dossenbach, Mark A. Goldstein, Michael D. Abneri, Kenneth Metviner, Levi C. Purec, and John Does 1–4.


Dated: May 6, 2025                         /s/ *Joseph N. Froehlich*
                                           Joseph N. Froehlich
                                           TROUTMAN PEPPER LOCKE LLP

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Spencer Savings Bank, S.L.A.

## DEFENDANTS

BNK Invest, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff  Bergen
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joseph Froehlich, Troutman Pepper Locke LLP, 305 Church at North Hills Street, Suite 1200, Raleigh, NC 27609, (919) 578-6337

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY

☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS

☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☒ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS

☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION

☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1964(c)

Brief description of cause:
Civil RICO Violation (Count I) and Conspiracy to Violate RICO (Count II)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE  Judge Michael E. Farbiarz   DOCKET NUMBER  2:21-cv-20485

DATE
May 6, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joseph N. Froehlich

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.   **Origin.**  Place an "X" in one of the seven boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.**  This section of the JS 44 is used to reference related cases, if any.  If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SPENCER SAVINGS BANK, S.L.A., | Civil Action No. |
| Plaintiff, | |
| v. | Electronically Filed |
| BNK INVEST, INC., ROBERT SEPERSKY, JONATHAN GOLDMAN, RONALD RAGANELLA, ROBERT MITCHELL, WILLIAM R. DOSSENBACH, JORDAN FARKAS, HARVEY SCHAFFLER, LEVI C. PUREC, TIMOTHY J. KLACE, KENNETH METVINER, LAWRENCE SEIDMAN, BRAD D. BUTLER, RICHARD J. LASHLEY, JOHN H. MEREY, LEO M. GOLDNER, MARK A. GOLDSTEIN, MICHAEL D. ABNERI, and JOHN DOES 1–4, | **RULE 7.1 DISCLOSURE STATEMENT OF PLAINTIFF SPENCER SAVINGS BANK, S.L.A.** |
| Defendants. | |

Consistent with Rule 7.1 of the Federal Rules of Civil Procedure, Plaintiff Spencer Savings Bank, S.L.A., by and through its undersigned counsel, certifies that it is a New Jersey chartered mutual savings and loan association, has no parent, and no publicly traded corporation owns 10% or more of its stock.

Dated: May 6, 2025

/s/ *Joseph N. Froehlich*
Joseph N. Froehlich
**TROUTMAN PEPPER LOCKE LLP**
305 Church at North Hills Street
Suite 1200
Raleigh, NC 27609
(919) 578-6337
joseph.froehlich@troutman.com