# EXHIBIT B

🚩 KeyCite Yellow Flag

Disagreed With by   U.S. S.E.C. v. Dunn,   S.D.N.Y.,   September 30, 2008

2007 WL 1946553
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re CRUDE OIL COMMODITY LITIGATION

No. 06 Civ. 6677(NRB).
|
June 28, 2007.

**Attorneys and Law Firms**

Geoffrey M. Horn, Vincent Briganti, Lowey Dannenberg Bemporad Selinger & Cohen, P.C., White Plains, NY, for Plaintiffs.

Leslie Smith, Bredale Rucker, Kirkland & Ellis, Chicago, IL, Peter D. Doyle, Kirkland & Ellis LLP, New York, NY, for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

 *1  Plaintiffs Richard Hershey, Michael Anastasio, Peter C. Fede, Fred Dray, Max Wulff, and Roberto Calle Gracey (collectively, "plaintiffs") brought this case on behalf of themselves and all others who purchased and/or sold light, sweet crude oil futures and options contracts on the New York Mercantile Exchange ("NYMEX"). The class of plaintiffs consists of various individuals who purchased and sold light, sweet crude oil futures contracts on the NYMEX during the putative class period, starting on January 1, 2001 and continuing until a date unknown by the plaintiffs but believed to extend at least until December 31, 2004 (the "class period"). The consolidated amended complaint alleges that BP America, Inc., BP Products North America, Inc., BP Corporation North America, Inc., and defendants John Does 1–10 (collectively "BP" or "defendants") acted to unlawfully manipulate the prices of light, sweet crude oil futures and options contracts traded on the NYMEX, in contravention of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 1 *et seq.* Plaintiffs claim that they suffered losses while buying and selling NYMEX light, sweet crude oil futures during the class period, which they attribute to defendants' manipulation of these contracts to artificial levels. Defendants moved to dismiss the complaint, on the basis that plaintiffs' pleading failed to meet the requirements of Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, defendants' motion is granted.

BACKGROUND[2]

I. Commodities Futures Markets

We begin with some brief background concerning commodities futures markets. A futures contract is an agreement to buy or sell a commodity and to deliver that item at a certain date in the future. Every aspect of a futures contract traded on the NYMEX, including those for crude oil, is standardized except for the price. The party selling the commodity, and thus who is obligated to deliver the commodity on the specified delivery date, is known as being on the "short" side, and to hold the short position on the futures contract. By contrast, the party on the other side of the deal is the buyer of the commodity, who is said to be on the "long" side. The buyer, who holds the long position on the futures contract, is obligated to accept delivery of the commodity on the specified delivery date. Options contracts are contracts which give the buyer the right, but not the obligation, to buy or sell a specified quantity of futures contracts at a predetermined price on or before a given date, regardless of the market price of the futures contract at the time the option is exercised. Only a small percentage of all futures contracts actually result in the delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature.

The crude oil market as a whole includes the exchange of physical barrels of oil, trading on registered futures exchanges such as NYMEX, and unregulated, over-the-counter ("OTC") markets. Many OTC crude oil contracts are based on NYMEX prices, including the final price for an expired NYMEX crude oil futures contracts. These contracts are called "NYMEX look-alikes." The crude oil marketing hub in Cushing, Oklahoma ("Cushing") is a significant marketing and trading hub for crude oil, and serves as the delivery (or price settlement) point for light, sweet crude oil futures and options contracts traded on NYMEX. West Texas Intermediate ("WTI") crude oil, one of the most actively traded domestic crudes, is the U.S. benchmark grade and is the primary deliverable grade under the NYMEX light, sweet crude oil futures and options contracts.

**\*2** Crude oil coming out of and going into Cushing is transported by a network of pipelines between oil producing areas and refineries throughout North America. As common carriers, oil pipelines are not allowed to refuse space to any shipper that meets their published conditions of service. If shippers nominate more volumes than the line can carry, the pipeline operator is supposed to allocate space in a non-discriminatory manner, usually on a pro rata basis. There are no alternative means to transport crude oil to Cushing, and no substitutes for the storage facilities in Cushing to store crude oil pending delivery against NYMEX crude oil futures contracts. Accordingly, supply and demand factors at the Cushing hub have a potential impact not only upon the price levels of crude oil at Cushing and its surrounding areas, but also throughout the entirety of the crude oil market.

II. Allegations in the Complaint

Plaintiffs allege that during most of the class period, the defendants were in control of substantial pipeline, storage, production, and gathering facilities related to the Cushing crude oil market.[3] As such, plaintiffs allege that defendants had the capacity to take advantage of price signals[4] by adjusting supply and demand factors at the Cushing hub to their advantage. CAC ¶ 38. According to plaintiffs, typically, futures markets have a "carrying charge" relationship, whereby the current futures contract price is less than the following months' futures contract prices. The amount of the difference is an amount sufficient to cover the carrying charge of the futures contract, which consists of interest on the capital invested in the commodity, storage costs, and insurance. *Id.* ¶ 40. Instead, plaintiffs note, throughout the class period, North American crude oil markets, and NYMEX crude oil futures in particular, were predominantly in "backwardation," where near prompt-month prices of WTI crude oil are higher than the prices prevailing in future months. *Id.* ¶ 39. As such, plaintiffs assert that defendants had an economic incentive to release, rather than restrict, supply to the marketplace, since the market no longer offers the market participant the incentive to hold stocks, as oil will be cheaper in the future and storing oil would result in a loss to the market participant. Yet, according to plaintiff, defendants held storage crude oil and deliverable position rather than delivering. *Id.* ¶ 43.

Since defendants engaged in such "particularly uneconomic" behavior, plaintiffs believe that the backwardation was "a sign or result of manipulative conduct." *See id.* ¶¶ 42–43. Plaintiffs allege that, by virtue of BP's market position, defendants had access to proprietary information on oil and gas deliveries, storage capacity, and other critical market data. *Id.* ¶ 44. "Armed with such proprietary data, the market participant has a substantial motive and opportunity to abuse this data in its commodities trading." *Id.* Plaintiffs assert that defendants engaged in at least seven methods of market manipulation, by: (1) exploiting their substantial energy assets located in Cushing, and other locations within and outside of Oklahoma, by acting in an uncommercial manner to deprive market participants of pipeline transmission, storage space, or crude oil, which were needed by these participants to fulfill their obligations for crude oil delivery at Cushing; (2) unlawfully conspiring with other market participants, including defendants John Does 1–10, to conceal the availability, release, and/or sale of defendants' supplies of crude oil at Cushing; (3) using proxies to sell its Cushing crude inventories as to not appear to the market as a seller of crude oil, and at prices determined by BP, by guaranteeing that the proxies would not receive less than the amount the proxy paid for the inventory or BP would make up the difference; (4) holding large, uncommercially sound positions in the soon-to-expire prompt-month NYMEX futures contract in excess of defendants' commercial needs; (5) engaging in the practice of "talking up" their non-existent commercial needs to drive up the price of NYMEX crude oil futures contracts; (6) representing to market participants and regulators that defendants' physical commitments supported both the maintenance of high storage levels in their Cushing storage facilities and their large prompt-month NYMEX crude oil futures positions; and (7) "bidding up" and/or "trashing" spot market prices for crude oil deliverable at Cushing in order to benefit defendants' crude oil physical and financial positions. *Id.* ¶ 56. Plaintiffs allege that these actions were taken by defendants to support their market manipulation and to conceal the acts from the marketplace. *Id.* ¶ 57. The cumulative effect of these actions, according to plaintiffs, was to create the false impression that the accessible deliverable supply of crude oil was limited at Cushing, thus driving up prices for NYMEX crude oil futures contracts which were deliverable only at Cushing. *Id.* ¶ 58. Plaintiffs also allege that defendants "squeezed" the crude oil market. Each month, as the prompt-month NYMEX crude oil futures contract moved closer to expiration, "[d]efendants' percentage of the NYMEX crude oil futures open interest frequently increased, its commercially unreasonable use of its storage, pipeline, and other Cushing assets frequently continued, and [d]efendants frequently squeezed, or manipulated to higher prices[,] the expiring NYMEX crude oil futures contracts." *Id.* ¶ 60.

**\*3** According to plaintiffs, BP profited from its manipulative acts because BP traded not only in the crude oil physical market and NYMEX crude oil futures and options market, but also conducted business involving the purchase and sale of OTC contracts in crude oil and other energy derivatives. *Id.* ¶ 68. Accordingly, assert plaintiffs, BP was able to price crude oil to ensure trading profits on their NYMEX crude oil futures and option contract positions, OTC crude oil financial contracts which were priced off of the exchange traded futures and options contracts, including NYMEX look-alikes, and the sale of physical crude oil. *Id.* ¶¶ 59, 68. These positions included BP's "large and commercially unreasonable" long NYMEX crude oil futures positions, which according to plaintiffs increased in value due to the artificially high NYMEX crude oil futures prices. *Id.* ¶ 59. Plaintiffs point to defendants' large trading operation, which registered profits in excess of $2 billion during 2004–05, as further evidence of defendants' market position and capacity to manipulate the market. *Id.* ¶ 69.

### DISCUSSION

I. The Commodity Exchange Act

Plaintiff's complaint asserts that defendants' alleged activities "constitute manipulation of the price of NYMEX light, sweet crude oil futures contracts, and/or the price of the crude oil underlying those contracts ... in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a)." CAC ¶ 83. The elements of a market manipulation claim under section 9(a) of the CEA are as follows: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *In re Natural Gas Commodity Litigation,* 337 F.Supp.2d 498, 507 (S.D.N.Y.2004) (*"In re Natural Gas I"* ). Section 22(a) of the CEA provides plaintiffs with a private cause of action to pursue claims of market manipulation. *See* 7 U.S.C. § 25(a).

II. Standard of Review

A. Rule 12(b)(6)

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), we are to accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Securities Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir.2000). Although a complaint attacked by a 12(b)(6) motion to dismiss "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S.—, 2007 WL 1461066, at \*8 (May 21, 2007). Plaintiffs' factual allegations must be sufficient to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true, even if doubtful in fact. *Id.*

B. Applicability of Rule 9(b) as opposed to Rule 8(a)

**\*4** The parties disagree as to whether the complaint is subject to the dictates of Rule 8(a), or the heightened pleading standards of Rule 9(b). Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). By contrast, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Rule 9(b) is designed "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991). Accordingly, the Second Circuit has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004).

District courts have split on the question of whether heightened pleading is required in a market manipulation claim under section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2). Some courts have declined to hold claims of manipulation under the CEA to the factual specificity required under Rule 9(b). *See, e.g., Commodity Futures Trading Comm'n v. Enron Corp.,* No. H–03–909, 2004 WL 594752, at \*3 (S.D.Tex. Mar. 10, 2004) (in case involving CFTC as plaintiff, as opposed to a private party, "[t]he CFTC's claims in Count I, under sections 6(c), 6(d), and 9(a)(2) of the CEA ... need not be pled with the factual specificity required by Fed.R.Civ.P. 9(b)."). Others have examined the facts as alleged in the complaint to see whether Rule 9(b) should apply. *See, e.g., Premium Plus Partners, L.P. v. Davis,* No. 04 Civ. 1851, 2005 WL 71191, at \*15 (N.D.Ill. Mar. 28, 2005) ("The instant manipulation claim

is not premised on allegations of fraud: Defendants are not alleged to have made any statements (false or otherwise) in connection with the alleged market manipulation. Although the Court does not purport to endorse a rule that Rule 9(b) pleading requirements *never* could apply to a CEA manipulation claim, the facts of this particular case do not appear consistent with the imposition of such requirements.") In what appears to be the only instance in which a court from this circuit has dealt with this precise issue, the court took the latter approach and held that although the amended complaint did not allege fraud under the CEA, the alleged manipulative scheme described in the amended complaint sounded in fraud and thus the complaint was required to comport with Rule 9(b). *In re Natural Gas Commodity Litigation,* 358 F.Supp.2d 336, 343 (S.D.N.Y.2005) (*"In re Natural Gas II"* ). Relying on the Second Circuit's opinion in *Rombach,* the court concluded that the complaint alleged a scheme that was "classically associated with fraud: the dissemination of *'inaccurate, misleading,* and *false* trading information,' and participation in 'a variety of *fraudulent* trade reporting strategies whose purpose was to create the precention [sic] of increased liquidity and demand for natural gas, and thus to manipulate the spot prices of natural gas.' " *In re Natural Gas II,* 358 F.Supp.2d at 343 (quoting Amended Complaint in that case) (emphasis in original).

**\*5** We agree with the case-specific approach taken by the court in *In re Natural Gas II.* Although plaintiffs have apparently carefully avoided the word "fraud" in their complaint, this is not dispositive in a determination of the essence of the factual premises of their claim, nor whether Rule 9(b) applies. The wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach,* 355 F.3d at 171. As such, we turn to the allegations as pled in the complaint to determine if they sound in fraud.

Plaintiffs allege that defendants unlawfully conspired with other market participants "to *conceal* the availability, release and/or sale" of defendants' supplies of crude oil and Cushing, and also used proxies to sell their crude oil inventories "so as to *not appear* to the market as a seller of crude oil" and "to support their manipulative acts and conceal such from the marketplace." CAC ¶ 2(b), (c) (emphasis added). Further, plaintiffs do assert that defendants made false or misleading statements in support of their claims of manipulation. Plaintiffs claim that defendants "engag[ed] in the practice of *'talking up'* their non-existent commercial needs in order to manipulate or drive up the price of NYMEX crude oil futures contracts," *id.* ¶¶ 2(e), 56(e) (emphasis added), *"represent[ed]* to market participants and regulators that [d]efendants' physical commitments supported both the maintenance of high storage levels in their Cushing storage facilities and their large prompt-month NYMEX crude oil futures positions," and engaged in " *'bidding up'* and/or *'trashing'* spot market prices for crude oil deliverable at Cushing" to benefit their crude oil physical and financial positions. *Id.* ¶ 56(g) (emphasis added). The gravaman of the complaint is essentially that "BP created the *false impression* that the accessible deliverable supply of crude oil was limited at Cushing. This *false impression* drove up prices for NYMEX crude oil futures contracts." *Id.* ¶ 58 (emphasis added). It is beyond question that the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand at Cushing by concealing its capacity and its actions, resulting in artificial prices. Accordingly, we conclude that plaintiff's market manipulation claim should be subject to the heightened pleading standard for Rule 9(b).

C. Compliance with Rule 9(b)

As noted *supra,* there are four elements to a market manipulation claim under section 9(a) of the CEA: (1) that the defendant possessed an ability to influence market prices; (2) that an artificial price existed; (3) that the defendant caused the artificial price; and (4) that the defendant specifically intended to cause the artificial price. *In re Natural Gas I,* 337 F.Supp.2d at 507. We believe that defendants have adequately pled the first two elements of a market manipulation claim: namely, that defendants had the capacity to influence crude oil prices, and that an artificial price existed. Thus, we turn to whether plaintiff has adequately pled the third and fourth elements of the claim: whether defendants caused the artificial price, and whether defendants intended to cause the artificial price.

1. Defendants' Actions that Caused the Artificial Price

**\*6** To satisfy the particularity requirements of Rule 9(b), a complaint sounding in fraud must specify the time, place, speaker, and content of the alleged statements and explain why those statements were misleading. *See Simon v. Castello,* 172 F.R.D. 103, 105 (S.D.N.Y.1997). To meet the requirements of Rule 9(b) in the context of a market manipulation claim, the plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed,

and what effect the scheme had on the market for the securities at issue." *In re Natural Gas II,* 358 F.Supp. at 344.

The actions allegedly taken by defendants that caused the artificial prices in the crude oil market are described in a wholly speculative and conclusory manner in the complaint. None of plaintiffs' allegations specify which of the defendants perpetrated the acts in question. In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and "lumping" all defendants together fails to satisfy the particularity requirement. *Simon,* 172 F.R.D. at 105 (citing *Doehla v. Wathne Ltd., Inc.,* No. 98 Civ. 6087(CSH), 1999 WL 56631, at *17–18 (S.D.N.Y. Aug. 3, 1999)). Also, plaintiffs do not identify the market players and proxies with whom defendants allegedly unlawfully conspired to conceal their participation in the marketplace with regard to the availability, release, and/or sale of defendants' crude oil supplies, other than the reference to John Does 1–10. They cannot point to one specific instance in which defendants or their agents made misleading statements "talking up" their "non-existent commercial needs," or "bidding up" or "trashing" spot market prices for crude oil deliverable at Cushing. Plaintiffs cannot point to which market participants and regulators were the recipients of representations by any defendant regarding the reasons behind the maintenance of high storage levels at their Cushing storage facilities, nor how the representations were misleading, nor which defendants or agents made the statements. It is clear that the pleading of fraud through completely unattributed statements and representations is insufficient to meet the dictates of Rule 9(b), even when a plaintiff alleges on information and belief that the statements were made by agents of the defendants. *See, e.g., In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 265 (2d Cir.1993). Further, absent the delineation of the class period, there is no date specified of when any of the purportedly manipulative acts were performed by defendants or their coconspirators. Courts have consistently held that such a lengthy time-frame fails to satisfy the particularity requirement of Rule 9(b). *Concorde Funds, Inc. v. Value Line, Inc.,* No. 04 Civ. 9932(NRB), 2006 WL 522466, at *5 (S.D.N.Y. Mar. 2, 2006) (collecting cases).

*7 An exception to the strict dictates of Rule 9(b) exists where allegations are based on "information and belief when facts are peculiarly within the opposing party's knowledge." *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993) (citing *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). This exception has been found to apply to market manipulation cases, where the exact mechanism of the scheme is likely to be unknown to the plaintiffs. *See, e.g., In re Blech Securities Litigation,* 961 F.Supp. 569, 580 (S.D.N.Y.1997). However, the ability to plead on information and belief should not be read as "free license to base claims of fraud on speculation and conclusory allegations"; rather, the complaint must "adduce specific facts supporting a *strong inference* of fraud." *Three Crown Ltd. Partnership,* 817 F.Supp. at 1040 (citing *Wexner*) (emphasis in original). Plaintiffs attempt to relieve themselves of the heightened standards of 9(b) by pleading their complaint on information and belief. CAC Introduction. However, the foundation for plaintiffs' theory of market manipulation is insufficient in specificity and detail to establish a strong inference of fraudulent behavior that caused the market manipulation.[5] The pleading of fraud through completely unattributed statements, representations, and concealments, even when plaintiff alleges on information and belief that they were made by agents of the defendants, is simply insufficiently detailed as to meet the dictates of Rule 9(b). *In re Time Warner Inc. Securities Litigation,* 9 F.3d at 265.

At bottom, there is an important distinction between the complaint here and that in *In re Natural Gas II,* where the court found the plaintiffs' allegations of market manipulation in the natural gas market had met the requisite level of specificity under Rule 9(b). In alleging market manipulation, the complaint in *In re Natural Gas II* relied upon the findings of a CFTC order, which found that two traders employed by defendant Western knowingly reported false pricing and volume information to a trade publication at the direction of a supervisor from June 1999 to February 2001, and that four Western traders knowingly delivered false reports of transactions to trade publications between March 2001 and December 2002. 358 F.Supp.2d at 344–45. Here, plaintiffs cannot point to a specific instance in which defendants engaged in a manipulative manner, and instead rely on conclusory statements about actions defendants allegedly took to further their scheme. In sum, the complaint is replete with innuendo and devoid of detail. Allowing plaintiffs' case to go forward on the basis of these conclusory allegations as to defendants' conduct would contravene an important purpose of Rule 9(b), which is "to discourage the filing of complaints as a pretext for discovery of unknown wrongs." *Madonna v. United States,* 878 F.2d 62, 66 (2d Cir.1989). We are loathe to allow plaintiffs to proceed to discovery in the hope that they will unearth information tending to establish that defendants misled or market manipulation, for this is precisely what Rule 9(b) attempts to prohibit. *Id.*

2. Defendants' Intent

**\*8** With regard to whether defendants intended to manipulate the market, Rule 9(b) provides that "[m]alice, intent, knowledge[,] and other condition of mind of a person may be averred generally," since plaintiffs are not expected to plead defendants' state of mind with particularity. Fed.R.Civ.P. 9(b). However, as noted earlier, this relaxation of Rule 9(b) is not a "license to base claims of fraud on speculation and conclusory allegations." *Simon,* 172 F.R.D. at 106. "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.,* 459 F .3d 273, 290–91 (2d Cir.2006).

Plaintiffs fail to satisfy either of these methods of adequately pleading intent. The complaint concisely sums up plaintiff's theory of motive and opportunity by essentially stating that defendants had a large presence in the crude oil market, the NYMEX crude oil futures and options market, and also engaged in the purchase and sale of OTC contracts in crude oil, and thus defendants "stood to gain large profits from their dealings in crude oil by manipulating prices of crude oil to obtain trading profits." CAC ¶ 68. Such a generalized motive, one which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent. *See Kalnit v. Eichler,* 264 F.3d 131, 140 (2d Cir.2001) (allegations that defendants were motivated to conceal certain communications to protect compensation provisions, to avoid personal liability, and to ensure that company would be able to obtain a more favorable business agreement are too generalized to be sufficient under Rule 9(b)); *Chill v. General Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996) (allegation that company's interest in justifying to shareholders $1 billion investment in subsidiary insufficient motive to show intent to defraud shareholders). Further, plaintiffs fail to allege facts which would constitute strong circumstantial evidence of intent.

Rather, plaintiffs preface their complaint with a recitation of: (1) complaints filed against BP and its subsidiaries and settlements arising therefrom and governmental investigations of BP; (2) a *Wall Street Journal* article dated August 29, 2006 which reported that the Commodity Futures Trading Commission ("CFTC") was investigating whether BP used information about its own pipelines and storage tanks at Cushing to influence crude-oil price benchmarks; and (3) BP p.l.c.'s having recently retained KPMG to investigate BP's trading culture. *See* CAC ¶ 4. The hearsay nature of these recitals underscores why they are an insufficient substitute for factual allegations, for "[p]laintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits," but instead "must prove to the court that their complaint is backed by specific facts supporting a strong inference of fraud." *Three Crown Ltd.,* 817 F.Supp. at 1040 n. 11. Moreover, the other complaints and governmental investigations relied upon by plaintiffs are unrelated to defendants' position in the crude oil market, and thus cannot be seen as sufficient facts upon which one could strongly infer manipulative intent or conduct in the crude oil market as alleged by plaintiffs in their complaint.[6]

*CONCLUSION*

**\*9** For the reasons stated above, defendants' motion to dismiss is granted in its entirety, and plaintiffs' complaint is dismissed.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1946553

---

**Footnotes**

1   In addition, defendants argue that plaintiffs lack standing to bring their claims, and also that their claims are time barred. In light of our conclusion with regard to plaintiffs' failure to comply with Rule 9(b), we do not find it necessary to reach these issues.

2   Except where indicated, there are no genuine issues regarding the following facts.

3   Specifically, plaintiffs allege that during most of the class period, defendants: (1) owned approximately 10 million barrels, or about 37% of available storage at Cushing; (2) through lease agreements and other arrangements and/or agreements, increased their control to between 48% to 52% of the storage capacity at Cushing; (3) owned and/or controlled a substantial portion (in excess of 60%) of the WTI crude oil supply at Cushing through their production and gathering assets; (4) controlled over 5 million barrels of storage in Midland, Texas, the principal market center for domestic Cushing-bound WTI crude oil; and (5) owned substantial pipelines leading into and out of Cushing. CAC ¶ 37.

4   A price signal is message sent to consumers and producers in the form of a price charged for a commodity. Such signals can be seen as an indication for producers to increase supplies and/or consumers to reduce demand.

5   We note that the recent Supreme Court decision in *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. —, 2007 WL 1773208 (June 21, 2007) may have some bearing on the present issues before us. *Tellabs* dealt specifically with the meaning of "strong inference" in the context of pleading scienter pursuant to § 21D(b)(2) of the Private Securities Litigation Reform Act of 1995 ("PLSRA"), 15 U.S.C. § 78u–4(b)(2). The Court explained that the PSLRA had codified the Second Circuit's stringent "strong inference" standard under Rule 9(b) as applied in the securities fraud context, albeit without concurrently codifying the Second Circuit's interpretation of "strong inference." *Id.* at *7–9. The Court went on to describe the task before it as one of deciding on a "workable construction of the 'strong inference' standard" in light of "the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Id.* at *9. As articulated by the Court, in considering whether a "strong inference" has been established, the following question should be posed: "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least a strong as any opposing inference" of nonfraudulent intent? *Id.* at *11. Obviously, we are cognizant that *Tellabs,* a decision interpreting the PSLRA, is not directly applicable to the case at hand, which involves applying Second Circuit interpretations of Rule 9(b) to the CEA. However, in light of the sentiment expressed by the Court in *Tellabs* that private securities fraud actions "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," *id.* at 4, and similar concerns raised by the Court in the context of private antitrust suits, *see Twombly,* 2007 WL 1461066, at *9 (noting that in light of the expense of antitrust discovery, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed") (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n. 17 (1983)), we believe that our adoption of a heightened pleading standard in the context of the claims presented herein is in conformity with the direction of the Court.

6   In fact, we note that the *Wall Street Journal* article itself states that the CFTC's civil investigation into BP's participation in the natural gas market "isn't related to" the other cases and investigations in the propane, gasoline, and natural gas markets referred to by plaintiffs. John R. Wilke, "BP Woes Deepen With New Probe," *Wall St. J.,* Aug. 29, 2006, at Cl.

We do acknowledge that the complaint also points to a settlement reached between defendant BP Corporation North America, Inc. and NYMEX, related to NYMEX crude oil trading. Although plaintiffs note that "[t]he settlement papers cited 10 violations in 2001 and 2002, which included wash trades, or simultaneous swaps of the same amount of a commodity for the same price," the plaintiffs do not assert that this behavior is a factual predicate for the manipulative conduct alleged in this case, which relates to defendants' crude oil holdings in Cushing.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.